Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

- - - - - - - - - - - - - - -

ROGER DEAN BANDY,        :
                         :
    Plaintiff  :
                         :
-vs-            :CASE NO. 7:11-CV-365
                         :
ADVANCE AUTO PARTS, INC.,  :
                         :
    Defendant  :

- - - - - - - - - - - - - - -

July 24, 2012
2:00 p.m.

DEPOSITION OF:
BARBARA A. MYERS

CENTRAL VIRGINIA REPORTERS
PO BOX 12628
ROANOKE, VIRGINIA
(540)380-5017

---

Page 2

1   APPEARANCES:
2
3   STRICKLAND, DIVINEY & STRELKA
        Roanoke, Virginia
4   By:  THOMAS E. STRELKA, ESQ.
5       Counsel on behalf of the Plaintiff
6   WOODS ROGERS
        Roanoke, Virginia
7   By:  AGNIS CHAKRAVORTY, ESQ.
        ERIN ASHWELL, ESQ.
8
        Counsel on behalf of the Defendant
9
10  ALSO PRESENT:  Jack Daniels
11
            * * * * *
12
13          I N D E X
14  EXAMINATION OF BARBARA A. MYERS    PAGE
15  By Mr. Strelka              5, 102
16  By Mr. Chakravorty             82
17
18          * * * * *
19
20         E X H I B I T S
21  NUMBER  DESCRIPTION          PAGE
22  1    Description of general
         warehouse worker         14
23
24  2    Gregg Henderson statement   20

---

Page 3

1         E X H I B I T S
2   NUMBER    DESCRIPTION          PAGE
3   3     Cassandra Hall statement    20
4   4     Kevin Gray statement       22
5   5     John King statement        23
6   6     Roger Bandy statement      23
7   7     Becky Walker statement     24
8   8     John Smith, team member
          action report             25
9
9     Documents re: Gary Miller,
10        Jonathan Brubaker and
          Chase Rexroad statement    31
11
12    10    Carl Pernal, yearly performance
          evaluation                40
13    11    Carl Pernal, final corrective
          interview                 42
14
15    12    Carl Pernal performance evaluation,
          2009                      43
16    13    Warren Smith, final corrective
          interview                 53
17
18    14    Warren Smith, evaluation form,
          2007                      59
19    16    Warren Smith, annual performance
          evaluation, 2008          62
20
21    16    Incidents of workplace hostility,
          violence, and aggression   64
22    17    Attendance policy addendum   71
23    18    Tobacco policy            73
24    19    United Way form           75

---

Page 4

1       The deposition of Barbara A. Myers was taken at
the law offices of Woods Rogers, Roanoke, Virginia,
2   on the 24th day of July, 2012, in the presence of
Thomas E. Strelka, Attorney for the Plaintiff, and
3   Agnis Chakravorty and Erin Ashwell, Attorneys for
the Defendant.
4       All formalities as to caption, certificate and
Notice of Filing were waived.  It was agreed that
5   Patricia D. Ahern, Notary Public in and for the
6   Commonwealth of Virginia, at Large, would take said
7   deposition in machine shorthand and reduce the same
8   to writing by means of Computer-Aided
9   Transcription.
10      Said deposition was taken subject alone to the
11  objections that are required by the Rules of the
12  Supreme Court of Virginia to be made at the time
13  that the deposition is taken.  All other objections
14  are reserved until the Trial.
15
16
17          BARBARA A. MYERS
18  was called as a witness and after having first been
19  duly sworn to tell the truth, the whole truth, and
20  nothing but the truth, was examined and testified
21  as follows:
22          EXAMINATION
23
24  BY MR. STRELKA:

Page 5

1    Q    Good afternoon, Ms. Myers.  I
2  appreciate you being here.  As I said before, no
3  one likes to take their afternoon sitting around
4  with a bunch of attorneys, so I appreciate you
5  comporting with the requirements of the subpoena.
6  Mr. Bandy appreciates your participation.  And it
7  is my understanding you are going on vacation after
8  this?
9    A    Yes.
10    Q    I hope you have a wonderful
11  vacation after this.  We will try to keep this
12  short and sweet and not stray too far.
13        Could you please state your entire
14  legal name for the record.
15    A    Barbara Anne Vandergrift Myers.
16    Q    Where do you work?
17    A    Advance Auto Parts.
18    Q    When did you begin working there?
19    A    April 23, 1990.
20    Q    What is your current title?
21    A    I am reclamation first shift team
22  manager.
23    Q    And do you recall an individual at
24  work by the name of Roger Bandy?

Page 6

1    A    Yes, I do.
2    Q    How do you know him?
3    A    He worked in the reclamation
4  department when I was transferred to that
5  department.
6    Q    I apologize, I'm going shift a
7  little bit right here, just some preliminary
8  things.
9        I am sure most likely your
10  attorneys have already informed you as to this.
11  Because we have a court reporter here today, and
12  she can only type what one person is saying at a
13  time, I would ask that you listen to the question
14  completely and then give your answer.
15        It is normal human nature for
16  people to talk over each other in a conversation,
17  so this is going to be a little stilted, because
18  she can only type up what one person is saying.  Is
19  that okay?
20    A    That is fine.
21    Q    You understand?
22    A    Yes, sir.
23    Q    I would also ask that if the
24  answer to a question I am asking is a yes or a no,

Page 7

1  that you articulate, you say yes or no, and that
2  you do not say uh-huh or huh-uh because that can
3  get confusing for the court reporter.  If she
4  mistakes a huh-uh for an uh-huh, you can imagine
5  the problems we can get into in the transcript.
6        Do you understand?
7    A    Yes.
8    Q    Furthermore, if you wish to take a
9  break, use the bathroom, get a drink, whatever you
10  need to do, just let me know if you need to take a
11  break, okay?
12    A    Yes.
13    Q    If I ask a question and you wish
14  to take a break, that is fine, you can take a
15  break, but you must answer my question before you
16  take a break.  Is that understood?
17    A    Yes.
18    Q    And the last, my favorite
19  question:  Are you under any sort of substance or
20  medication today that might affect your testimony?
21    A    No.
22    Q    Thank you very much.  So you just
23  informed us how you knew Roger Bandy.  Are you
24  familiar with when Mr. Bandy began working for

Page 8

1  Advance Auto?
2    A    Yes.
3    Q    It is my understanding that you
4  were one of Mr. Bandy's direct managers; is that
5  correct?
6    A    Yes.
7    Q    When you were his direct manager,
8  what did Mr. Bandy do for Advance Auto?
9    A    He did numerous things.  He
10  operated a forklift.  He worked our core area.  He
11  worked our defect area.  There was times when he
12  helped break trailers.
13    Q    As his direct manager, were you in
14  a position to observe his work product?
15    A    Yes.
16    Q    As his direct manager, did you
17  ever assist in the drafting of work performance
18  evaluations?
19    A    Yes.
20    Q    For Mr. Bandy?
21    A    Yes.
22    Q    Are you aware of Mr. Bandy being
23  transferred to a certain position at Advance Auto
24  in 2009?

Page 9

1          MR. CHAKRAVORTY:  Objection as to
2     form.
3
4     BY MR. STRELKA:
5          Q     Even if he objects, you still have
6     to answer my question.
7          A     No.
8          Q     Do you know where Mr. Bandy was
9     working in 2009?
10         A     He was working in the reclamation
11    department.
12         Q     Was he working as a warehouse
13    worker at that time?
14         A     Yes.
15         Q     2009?
16         A     Yes.
17         Q     Could you describe for me the job
18    duties Mr. Bandy had working in the reclamation
19    department at Advance Auto as a warehouse worker in
20    2009?
21         A     Well, it could vary from day to
22    day.  He could have, like I said, been operating a
23    forklift, moving boxes of work to and from team
24    members that would be working the cores.  He could

Page 10

1     have been working in the defect area where he would
2     be scanning the product, putting it where it goes
3     per vendor, or he could have been on the dock
4     breaking trailers at any given time.
5          Q     At this time in 2009, we are
6     discussing the reclamation department.  Am I saying
7     that correctly?
8          A     Yes.
9          Q     Are there any divisions or
10    different sections of the reclamation department?
11         A     There is different areas, but it
12    is all one department.
13         Q     Could you describe the different
14    areas that are in the reclamation department?
15         A     We have our core area where they
16    process the cores that are returned from the
17    stores.  We have the dock area where we break the
18    trailers with the returns that are coming back from
19    the stores where the trailers are broken and sorted
20    based on where they are going.
21               We have a defect area where all
22    the defects go that have to be processed.  We have
23    a callback area where callbacks are processed to be
24    sent back to the vendor, which is new product.  We

Page 11

1     have overstock, which is product that is going back
2     into our inventory in the warehouse.
3          Q     Are there employees at Advance
4     Auto that just work in a particular section of the
5     reclamation department?
6          A     No.  They are moved around.
7          Q     So your testimony is that anyone
8     who works in the reclamation department doesn't
9     work in just one area?
10         A     They can be moved, yes.
11         Q     In this case, I don't know if you
12    have read the complaint or any of the documents
13    that have been shifted back and forth in this case,
14    but the Plaintiff, Mr. Bandy, has indicated that he
15    was working in the reclamation department in 2009,
16    but that he was transferred to the defect section
17    in January of 2010.  Do you find that to be an
18    accurate statement?
19               MR. CHAKRAVORTY:  Hold on one
20    second.  Let me make an objection and
21    make it a continuing one.
22               MR. STRELKA:  Sure.
23               MR. CHAKRAVORTY:  I don't want to
24    keep doing it.  That part of the lawsuit

Page 12

1     has been stricken.  I am going to make
2     the objection.  The judge has already
3     ruled, so I object to the line of
4     testimony.
5               Go ahead and answer.  You might
6     want to rephrase the question.
7
8     BY MR. STRELKA:
9          Q     Why don't you go ahead and answer.
10         A     There is no such thing as a
11    transfer from one part of reclamation to the other.
12         Q     Okay.  So --
13         A     It is all general warehouse
14    worker.
15         Q     So Mr. Bandy was never assigned to
16    work just in the defect section?
17         A     No, sir.
18         Q     Are you aware of any employees at
19    Advance Auto that worked just in the defect
20    section?
21         A     No, sir.
22         Q     So any employee that does work in
23    the defect section also works, as you said, in
24    other sections?

Page 13

1        A    Yes.
2        Q    If an employee at Advance Auto is
3    working in the defect section -- and I know it is
4    not only in the defect section. But if an employee
5    at Advance Auto is working only in the defect
6    section, what type of job duties are specific to
7    the defect section of the reclamation department?
8        A    We get product back from the
9    stores in totes and in a Gaylord box. The product
10    has to be sorted and put on a cart, and then they
11    are scanned. They have a tag on them, and then
12    they are scanned to the vendor box or thrown away
13    if it is a store-in-field product. That is what
14    they do in defects.
15        Q    Working in the defect section, if
16    an employee was working in the defect section, does
17    that job require heavy lifting?
18        A    Each section requires lifting.
19        Q    So anyone who works in the
20    reclamation department is going to have to lift
21    things?
22        A    Yes.
23
24            (Deposition Exhibit Number 1

Page 14

1            was marked for identification.)
2
3    BY MR. STRELKA:
4        Q    I am now handing you a document
5    that has been labeled Exhibit 1. Do you recognize
6    that document?
7        A    Yes.
8        Q    What is that document?
9        A    That is a description of what a
10    general warehouse worker job entails.
11        Q    Would this description have
12    applied to Roger Bandy's position when he worked
13    for Advance Auto?
14            MR. CHAKRAVORTY: Objection as to
15        form.
16            THE WITNESS: Yes.
17
18    BY MR. STRELKA:
19        Q    Are you aware if Mr. Bandy worked
20    in any particular section of the reclamation
21    department more so than any other?
22        A    Not really, no.
23        Q    So is it then your testimony that
24    he worked in all the different sections equally?

Page 15

1        A    I couldn't say equally, but moved
2    around.
3        Q    Could you give me any idea as to
4    time by Mr. Bandy spent in any of these sections?
5    In other words, what I am trying to get at is: Did
6    Mr. Bandy work in any one section more than any
7    other section?
8        A    I would say yes.
9        Q    What section would he have worked
10    more in?
11        A    When I first came back to the
12    reclamation department, he worked the core area.
13        Q    When was that?
14        A    Six years ago, somewhere like
15    that.
16        Q    Did that maintain through the time
17    of his termination?
18        A    No. We -- no, it did not.
19        Q    How did it change?
20        A    We started cross-training more.
21    Everyone became involved in the cross-training to
22    make us more valuable, get all the general
23    warehouse workers where they could help each other.
24        Q    Could you define the term

Page 16

1    cross-training as you just used it?
2        A    We would cross-train people that
3    had never used an RF scanner before. So we
4    introduced RF scanners to team members, how to
5    process overstocks.
6            If you had never worked in
7    callbacks, we had people trained to work in
8    callbacks. Same way as breaking trailers, defects,
9    overstock. It was a rotation system.
10        Q    Have you ever received any
11    complaints from any of your employees working in
12    the defect section?
13        A    No, sir.
14        Q    That would include Mr. Bandy?
15        A    Yes.
16        Q    At the time of his termination,
17    are you aware if Mr. Bandy was offered any
18    severance from Advance Auto?
19        A    I was not involved in that.
20        Q    So you don't know?
21        A    I do not know.
22        Q    Do you know why Mr. Bandy was
23    terminated from Advance Auto?
24        A    Yes.

Page 17

```
 1        Q    Why was that?
 2        A    He was involved in an incident
 3   with another team member which was against our
 4   policy of threatening and intimidation.
 5        Q    Who was that other team member?
 6        A    John King.
 7        Q    Could you describe the incident?
 8        A    I didn't witness --
 9             MR. CHAKRAVORTY:  Objection as to
10   form.  Go ahead.
11             THE WITNESS:  I did not witness
12        the incident.  I only know what I was
13        told.
14
15   BY MR. STRELKA:
16        Q    What were you told?
17        A    I had another team member come to
18   me visibly shaken up, that she had overheard
19   Mr. Bandy and John King arguing and Mr. Bandy
20   shaking his fist.  And she was visibly shook up
21   about it.  She was nervous that they were going to
22   come to blows.
23             So I called my manager, who -- his
24   office was right upstairs above mine, and he came
```

Page 18

```
 1   downstairs and addressed the situation.
 2        Q    Who was this employee that told
 3   you about this incident?
 4        A    Cassandra Hall.
 5        Q    What is her title?
 6        A    She is a general warehouse worker.
 7        Q    Who was the employee at Advance
 8   Auto that you reported this to?
 9        A    Greg Henderson.
10        Q    His title?
11        A    At the time, he was reclamation
12   manager.
13        Q    Do you know what the sum and
14   substance of this argument or altercation was about
15   between the two gentlemen?
16        A    Only what I was told, that it was
17   over the miners that was caught in the cave over in
18   Chile.
19        Q    Are you aware of any other
20   altercation that Mr. Bandy may have been involved
21   in at Advance Auto other than this incident?
22        A    No, sir.
23        Q    Did this surprise you?
24        A    Yes.
```

Page 19

```
 1        Q    Why did it surprise you?
 2        A    Because he was a fairly quiet man.
 3        Q    What about Mr. King?
 4        A    He was quiet as well.  They
 5   usually just went in there and did their jobs.
 6        Q    What kind of worker was Mr. Bandy?
 7        A    He was a very good worker.
 8        Q    What kind of worker was Mr. King?
 9        A    Very good worker.
10        Q    And so this is the incident that
11   led to Mr. Bandy's termination?
12        A    Yes, sir.
13        Q    Do you know of any other witnesses
14   who observed this incident?
15        A    Yes, sir.
16        Q    Who was that?
17        A    Kevin Gray.
18        Q    What is his title?
19        A    General warehouse worker.
20        Q    Do you know if Mr. King was
21   terminated as a result of this incident?
22        A    Yes.
23        Q    He was?
24        A    Yes.
```

Page 20

```
 1        Q    Was there an investigation of this
 2   incident?
 3        A    Yes it was.
 4
 5             (Deposition Exhibit Number 2
 6             was marked for identification.)
 7
 8   BY MR. STRELKA:
 9        Q    The court reporter has just handed
10   you a document labeled Exhibit 2.  I would like to
11   ask you to look at this document for me.  Do you
12   recognize that document?
13        A    Yes, sir.
14        Q    What is that document?
15        A    It is the statement that Greg
16   Henderson made at the time of the incident.
17
18             (Deposition Exhibit Number 3
19             was marked for identification.)
20
21
22   BY MR. STRELKA:
23        Q    The court reporter has just handed
24   you a document that we have labeled Exhibit 3.  Do
```

Page 21

1  you recognize this document?
2      A    Yes, sir.
3      Q    What is this document?
4      A    It is the statement that Cassandra
5  Hall made.
6      Q    Is this her handwriting?
7      A    Yes, sir.
8      Q    What does the statement regard?
9      A    The incident between John King and
10 Roger Bandy.
11     Q    Do you feel that this note is
12 reflective of what Ms. Hall told you verbally about
13 the incident?
14     A    I do.
15     Q    Do you recall anything that she
16 may have said about the incident that is not
17 contained in this note?
18     A    No, sir.
19     Q    Do you recall Ms. Hall ever making
20 a complaint about any other altercation at Advance
21 Auto?
22     A    No, sir, I do not.
23     Q    Do you recall Ms. Hall making a
24 complaint about anybody regarding anything at

Page 22

1  Advance Auto?
2      A    No, sir.
3      Q    So this was the first?
4      A    To my knowledge, that I remember.
5      Q    It would be a first for Mr. Bandy
6  too, wouldn't it?
7      A    Yes.
8
9          (Deposition Exhibit Number 4
10          was marked for identification.)
11
12 BY MR. STRELKA:
13     Q    The court reporter has just handed
14 you a two-page document that has been labeled
15 Exhibit 4. Do you recognize this document?
16     A    Yes, sir.
17     Q    What is this document?
18     A    It is the statement that Kevin
19 Gray made about the incident involving Mr. Bandy
20 and John.
21     Q    Is this Mr. Gray's handwriting?
22     A    Yes, it is.
23
24          (Deposition Exhibit Number 5

Page 23

1          was marked for identification.)
2
3  BY MR. STRELKA:
4      Q    I would like you to take a look at
5  the document that has been labeled Exhibit 5. Do
6  you recognize this document?
7      A    Yes, sir.
8      Q    What is this document?
9      A    It is the statement that John King
10 made.
11     Q    Is it your understanding that that
12 is his handwriting?
13     A    Yes, sir.
14
15          (Deposition Exhibit Number 6
16          was marked for identification.)
17
18 BY MR. STRELKA:
19     Q    The court reporter has now handed
20 you a document that has been labeled Exhibit 6. Do
21 you recognize this document?
22     A    Yes, sir.
23     Q    What is this document?
24     A    It is the statement that Mr. Bandy

Page 24

1  made.
2      Q    This is regarding the incident,
3  the altercation, with Mr. King?
4      A    Yes, sir.
5      Q    It is your understanding that that
6  is Mr. Bandy's handwriting?
7      A    Yes.
8
9          (Deposition Exhibit Number 7 was
10          marked for identification.)
11
12 BY MR. STRELKA:
13     Q    You have just been handed a
14 document that has been labeled Exhibit 7. Do you
15 recognize that document?
16     A    I have never seen this before.
17     Q    Okay. Do you see the name at
18 bottom of the document?
19     A    Yes.
20     Q    Becky Walker?
21     A    Yes.
22     Q    Who is Becky Walker?
23     A    She is our HR at Blue Hills.
24     Q    Is she the director of HR?

Page 25

1        A     I don't know.
2        Q     You don't know her title?
3        A     No.
4        Q     But you know that she works in HR
5   at Advance Auto?
6        A     Yes.
7        Q     Do you know if she was involved in
8   any way in an investigation of the incident?
9        A     No, I do not.
10       Q     Did you ever speak with Ms. Walker
11  about the incident itself?
12       A     No, I did not.
13       Q     Do you know if that is Ms.
14  Walker's handwriting?
15       A     Yes.
16       Q     That is Ms. Walker's handwriting?
17       A     Yes.
18
19              (Deposition Exhibit Number 8
20              was marked for identification.)
21
22  BY MR. STRELKA:
23       Q     You have just been handed a
24  document labeled Exhibit 8.  Do you recognize this

Page 26

1   document?
2        A     I have never seen this particular
3   document.
4        Q     You note at the top it says team
5   member action report?  Do you see that?
6        A     Yes.
7        Q     Do you know what a team member
8   action report is?
9        A     Yes.
10       Q     What is a team action report?
11       A     That is a report that we fill out
12  for numerous things involving a team member.
13       Q     When you say numerous things,
14  would that include disciplinary actions?
15       A     Yes.
16       Q     If I represented to you that this
17  was a team member action report that was generated
18  as a result of the incident in question, would you
19  have any doubt that that is what that document is?
20       A     No, I would not.
21       Q     Do you see the name at the bottom
22  of the document?
23       A     Yes, sir.
24       Q     Who is John Smith?

Page 27

1        A     He is my boss.  He is inbound
2   manager.
3        Q     You see under the heading it says,
4   Give full explanation of action taken.  Below that
5   it states, We completed an extensive investigation.
6   You were involved in that investigation, were you
7   not?
8        A     No, sir.
9        Q     Were you ever asked any questions
10  by Mr. Smith in regards to the investigation?
11       A     No.
12       Q     Do you know of anyone who was
13  asked questions by Mr. Smith or anyone in the
14  administration regarding the investigation?
15       A     Just Mr. Bandy and John King.
16       Q     Do you know if -- so those are the
17  only people that you know --
18       A     That I know.
19       Q     -- were asked questions?
20       A     Yes.
21       Q     Do you know approximately when the
22  investigation began?
23       A     The day of the incident was in the
24  afternoon, and Cassandra made her statement that

Page 28

1   afternoon, and then it continued the next morning,
2   the next day.
3        Q     It goes on further beyond the
4   words extensive investigation.  It says, Including
5   two witness statements, which are all on file.  Do
6   you know what witness statements to which that is
7   referring?
8        A     That would be Cassandra Hall and
9   Kevin Gray.
10       Q     Do you know of anyone else having
11  made a witness statement that may not be in that
12  file?
13       A     No, I do not.
14       Q     Are you aware of any employee or
15  employees who replaced Mr. Bandy after he was
16  terminated?
17       A     Yeah.  The positions were open for
18  bid.
19       Q     Do you know who was hired?
20       A     Oh, my.  No, I do not.  I'm sorry.
21       Q     That's okay.  You can only testify
22  as to what you know.  That is all I want is what
23  you know.
24       A     I can't get the dates straight in

Page 29

1   my head.
2         Q     That's okay.  Neither can I half
3   the time.  So you could not identify here today who
4   Mr. Bandy's replacement was?
5               MR. CHAKRAVORTY:  Objection as to
6         form.
7               THE WITNESS:  No.
8
9   BY MR. STRELKA:
10        Q     Do you know the ages of any of the
11  individuals who may have replaced Mr. Bandy?
12              MR. CHAKRAVORTY:  Objection as to
13        form.
14              THE WITNESS:  I cannot remember
15        who bid it in at that time.
16
17  BY MR. STRELKA:
18        Q     I know you say you can't remember
19  who.
20        A     Uh-huh.
21        Q     But that may be because you just
22  don't remember their name?
23        A     Right.
24        Q     Do you know if any of the

Page 30

1   individual or individuals who replaced Mr. Bandy --
2   strike that.  I am going to repeat my question from
3   earlier.
4         Do you know the ages of any of the
5   individuals or individual who replaced Mr. Bandy?
6         A     No.
7         Q     Do you know the approximate age of
8   any of those individuals?
9               MR. CHAKRAVORTY:  Objection as to
10        form.
11              THE WITNESS:  No.
12
13  BY MR. STRELKA:
14        Q     Do you know if any of the
15  individual or individuals who replaced Mr. Bandy
16  were younger than Mr. Bandy?
17              MR. CHAKRAVORTY:  Objection as to
18        form.
19              THE WITNESS:  I would say yes.
20
21  BY MR. STRELKA:
22        Q     Are you aware of Mr. Bandy's age
23  at the time of his termination?
24        A     I don't, no.

Page 31

1         Q     He was older than 60; is that
2   right?
3         A     Yes.
4
5               (Deposition Exhibit Number 9
6               was marked for identification.)
7
8   BY MR. STRELKA:
9         Q     You have now been handed a
10  three-page document that has collectively been
11  identified as Exhibit 9.  I would like you to take
12  a moment and look at this document.
13        A     Okay.
14        Q     Do you recognize this document?
15        A     I have never seen it before.
16        Q     Do you see the name on the first
17  page?
18        A     Yes.
19        Q     Gary Miller?
20        A     Yes.
21        Q     Who is Gary Miller?
22        A     He is one of our team members in
23  the reclamation department.
24        Q     Was he Mr. Bandy's replacement?

Page 32

1               MR. CHAKRAVORTY:  Objection as to
2         form.
3               THE WITNESS:  I am not sure.
4
5   BY MR. STRELKA:
6         Q     Is Mr. Miller younger than
7   Mr. Bandy?
8         A     Yes.
9         Q     Do you know the age of Mr. Miller?
10        A     No.
11        Q     Do you know if Mr. Miller is
12  younger than the age of 40?
13        A     No, I do not know.
14        Q     But you know that he was younger
15  than Mr. Bandy?
16        A     Yes.
17        Q     On the next page that has been --
18  just so you know, I may refer to some of these
19  pages as having a BATES label.  I might say the
20  page has a BATES label.  That is the little number
21  in the bottom right corner.
22        A     Okay.
23        Q     So right now I am saying I would
24  like you to take a look at the page that is BATES

Page 33

1   labeled 1393. It is the second page of this
2   exhibit.
3       A    All right.
4       Q    Do you see the name at the top of
5   that page?
6       A    Yes.
7       Q    Jonathan Brubaker?
8       A    Yes.
9       Q    Do you know him?
10      A    Yes.
11      Q    He works for Advance Auto?
12      A    Yes, he does.
13      Q    What does he do there?
14      A    He is a general warehouse worker.
15      Q    Did he replace Mr. Bandy?
16          MR. CHAKRAVORTY: Objection to
17   form.
18          THE WITNESS: I'm not sure.
19
20   BY MR STRELKA:
21      Q    Do you know if he is younger than
22   Mr. Bandy?
23      A    Yes, he is.
24      Q    Do you know the age of

Page 34

1   Mr. Brubaker?
2       A    No, I do not.
3       Q    Do you know if Mr. Brubaker is
4   younger than age 40?
5       A    I do not know.
6       Q    You can probably guess where we
7   are going for the third page of the exhibit.
8       A    Yes.
9       Q    Do you see the name at the top of
10  the page of what has been BATES labeled 1394?
11      A    Yes.
12      Q    Chase Rexroad?
13      A    Yes.
14      Q    Am I saying that right?
15      A    Yes.
16      Q    Do you know if Mr. Rexroad
17  replaced Mr. Bandy?
18      A    No, I do not.
19      Q    Do you know if Mr. Rexroad was
20  younger than Mr. Bandy?
21      A    Yes, he is.
22      Q    Do you know if Mr. Rexroad is
23  younger than the age of 40?
24      A    Yes, he is.

Page 35

1       Q    All three of these workers work in
2   the reclamation department?
3       A    Yes.
4       Q    Okay. Thank you.
5           Do you know an individual by the
6   name of Carl Pernal or Pernal?
7       A    Pernal.
8       Q    Is that how you say it, Pernal?
9       A    Yes.
10      Q    What did he do for Advance Auto?
11      A    At one time he worked in
12  receiving, at one time he worked in the guard
13  house, and then he was in reclamation.
14      Q    Was he terminated from Advance
15  Auto?
16      A    Yes, he was.
17      Q    What was the last position that he
18  had at Advance Auto prior to his termination?
19      A    He was a general warehouse worker
20  in the reclamation department.
21      Q    So he was in essentially the same
22  position as Mr. Bandy?
23      A    Yes, sir.
24      Q    Do you know how old Mr. Pernal

Page 36

1   was?
2       A    No, I do not know.
3       Q    Do you know if he was over the age
4   of 40?
5       A    Oh, yes.
6       Q    Would you say he was close in age
7   to Mr. Bandy?
8       A    I would say yes, but it is a
9   guess.
10      Q    Did you know why Mr. Pernal was
11  terminated?
12      A    He did not meet performance
13  standards.
14      Q    What standards did he not meet?
15      A    We have -- I don't know how to
16  describe it. We have standards that in almost
17  every area in the reclamation department to meet an
18  expected -- an expectation to meet, and he failed
19  to meet those.
20      Q    Can you recall any of those
21  expectations at this time?
22      A    We enter data, and it gives a
23  percentage of an assignment. You have an
24  assignment, okay? And you key that in, and it

Page 37

1  gives you a percentage of the time from he started
2  the assignment until the time he ended of what his
3  performance was.
4        Q     When you say entered in, could you
5  describe --
6        A     Into the computer.  It is a
7  database.
8        Q     Is that --
9        A     A program.
10       Q     I want to just -- I appreciate you
11  being very forthcoming with these answers, but just
12  in the last couple times, you have talked over me.
13       A     I am sorry.
14       Q     It is okay.  It is the normal way
15  of talking.
16             How, specifically, would
17  Mr. Pernal enter in his time in which he was
18  working on or completing a task?
19       A     It is done by the RF from the time
20  you scan the first piece until you scan your last
21  piece.
22       Q     So Mr. Pernal had a personal
23  scanner along with him?
24       A     Yes.

Page 38

1        Q     And that scanner -- does everyone
2  in the reclamation department have a similar
3  scanner?
4        A     Yes -- not everyone, no, depending
5  on your job of what you are doing that day.
6        Q     Would Mr. Bandy have had such a
7  scanner?
8        A     Yes.
9        Q     This scanner and the way that the
10  time is computed, this is -- the number generated
11  is used by Advance Auto to determine productivity;
12  is that correct?
13       A     Yes.
14       Q     Would you refer to that number as
15  a standard?
16       A     Yes.
17       Q     Do you know if Mr. Pernal was ever
18  put on any sort of performance improvement plan?
19       A     Yes.
20       Q     Would that have been called the
21  LMS achievement plan?
22       A     Yes.
23       Q     What is the LMS achievement plan?
24       A     It is where we do observations and

Page 39

1  work with the individual team members, and we
2  observe them from the start to the finish of
3  assignments.  We watch how they handle the product.
4  We have best practices of how to do the job.  Make
5  sure the team member is doing the job.  We coach
6  them and mentor them, show them things they could
7  do to improve their performance, and we make
8  suggestions to them.
9        Q     What does LMS stand for?
10       A     Labor management system.
11       Q     Do you know if Mr. Pernal improved
12  after the LMS achievement plan was executed?
13       A     He did not.
14       Q     And that is why he was terminated?
15       A     Yes.  He did not always practice
16  what we showed him.
17       Q     Was Mr. Pernal put in the
18  reclamation department in order that he would fail
19  and be terminated?
20       A     No.
21       Q     Was Mr. Bandy put in the
22  reclamation department in order that he would fail
23  and thus be terminated?
24       A     No.

Page 40

1        Q     Whose decision was it to terminate
2  Mr. Pernal?
3        A     It was the process of the program.
4  Each level of disciplinary had been done, and then
5  it was covered by our manager.
6        Q     Who was that?
7        A     Greg Henderson.
8        Q     Did you have any input as to that
9  decision?
10       A     Yes.
11       Q     Did anyone else have any input as
12  to that decision?
13       A     Yes.
14       Q     Who would that be?
15       A     I would say John Smith.
16       Q     Did Jack Daniels have any input as
17  to that decision?
18       A     I am not sure.
19
20             (Deposition Exhibit Number 10
21             was marked for identification.)
22  BY MR. STRELKA:
23       Q     You have now been handed a
24  document which has been labeled Exhibit 10.  Do you

Page 41

1  recognize this document?
2      A    Yes, sir.
3      Q    What is this document?
4      A    It is the yearly performance
5  evaluation done on a team member.
6      Q    And who was this done for?
7      A    Carl Pernal.
8      Q    And this was for the year of 2008?
9      A    Yes, sir.
10      Q    According to this performance
11  management worksheet, how did Mr. Pernal fare as
12  far as work product is concerned in 2008?
13      A    He met performance expectations.
14      Q    Does this document indicate any
15  deficiency in Mr. Pernal's work product?
16      A    No, sir.
17      Q    Could you describe your personal
18  observances of Mr. Pernal's work product in 2008?
19      A    He was not in our department at
20  that time.
21      Q    So you didn't have an opportunity
22  to observe his work product?
23      A    No, sir.
24      Q    Do you know why he was transferred

Page 42

1  to your section?
2      A    The guards -- it was outsourced,
3  our security.
4      Q    So it is my understanding of what
5  you just testified that Mr. Pernal was working as a
6  security guard, and then that position was
7  outsourced, and then he was moved into reclamation;
8  is that right?
9      A    Yes.  He wasn't really a security
10  guard.  He worked the gate with inbound trucks
11  coming in.
12
13          (Deposition Exhibit Number 11
14           was marked for identification.)
15
16  BY MR. STRELKA:
17      Q    The court reporter has now handed
18  you a document which has been labeled Exhibit 11.
19  Do you recognize this document?
20      A    Yes.
21      Q    What is this document?
22      A    This is the final corrective
23  interview that was done on Carl Pernal.
24      Q    Is that your signature at the

Page 43

1  bottom?
2      A    As a witness, yes.
3      Q    Is this the form that was given to
4  him that terminated Mr. Pernal's employment with
5  Advance Auto?
6      A    I am not sure.  I was not there
7  when he was terminated.  This would not be the
8  termination.
9      Q    I'm sorry.
10          MR. CHAKRAVORTY:  The document
11  speaks for itself.
12          MR. STRELKA:  Yes, sorry.
13
14          (Deposition Exhibit Number 12
15           was marked for identification.)
16
17  BY MR. STRELKA:
18      Q    I now hand you a document that has
19  been labeled Exhibit 12.  Do you recognize that
20  document?
21      A    Yes, sir.
22      Q    What is that document?
23      A    It is the performance evaluation
24  done on all team members, and this was for Carl

Page 44

1  Pernal.
2      Q    And for what year was this
3  performed for Carl Pernal?
4      A    2009.
5      Q    At this time where was Mr. Pernal
6  working?
7      A    He was in reclamation.
8      Q    As a general warehouse worker?
9      A    Yes.
10      Q    According to this form, how did
11  Mr. Pernal fare in 2009?
12      A    Satisfactory, successfully met
13  expectations.
14      Q    So the information on this form,
15  did this coincide with your personal observations
16  of Mr. Pernal's work product in 2009?
17      A    Yes.
18      Q    Do you see where under the column
19  success factors, the third one down on the front
20  page, it says applied learning?
21      A    Uh-huh.
22      Q    And then to the right of that is
23  an S for satisfactory, and to the right of that it
24  says quick learner.  Do you see that?

Page 45

1    A    Yes.
2    Q    Do you know who entered that
3  information in there?
4    A    Yes.
5    Q    Who did that?
6    A    Greg Henderson.
7    Q    In your estimation, was Mr. Pernal
8  a quick learner?
9    A    It depends on what area he was in.
10    Q    Could you go into detail about
11  that?
12    A    I mean, if he was in callback,
13  which is -- it would have been a little easier to
14  sort out.  Each area of reclamation is different.
15  I mean, if we had him pulling freight off of a
16  trailer, he would have been quick to learn that,
17  so...
18    Q    Did Mr. Pernal work in the
19  callback section in 2009?
20    A    I would say yes.
21    Q    Did he pull freight off of -- I
22  think you said trucks in 2009?
23    A    Uh-huh.
24    Q    That is a yes?

Page 46

1    A    Yes.
2    Q    And there are no deficiencies of
3  work product for Mr. Pernal indicated on this form,
4  are there?
5    A    No.
6    Q    Do you know an employee named
7  Homer Smith?
8    A    Yes.
9    Q    Who is Homer Smith?
10    A    He worked in the reclamation
11  department.
12    Q    Is he still working there?
13    A    No, sir.
14    Q    Was he terminated?
15    A    Yes.
16    Q    Do you know why he was terminated?
17    A    Job performance.
18    Q    Can you give any specifics?
19    A    He did not meet to performance
20  standards.
21    Q    Do you know any particular areas
22  of job performance in which he was found deficient?
23    A    Operating the scanner in a core
24  area.

Page 47

1    Q    Is that similar to Mr. Pernal?
2    A    Yes, sir.
3    Q    Was he placed on any sort of
4  performance improvement plan?
5    A    Yes.
6    Q    Is that with the LMS achievement
7  plan?
8    A    Yes.
9    Q    The achievement plan didn't work
10  for Mr. Smith, did it?
11    A    No.
12    Q    Whose decision was it to terminate
13  Mr. Smith?
14    A    It was a result of his failing to
15  meet the standards.  It would have been -- he went
16  through the procedure, the process.  So it would
17  have went before my manager, Greg Henderson and
18  John Smith.
19    Q    And did you have any input as to
20  that decision?
21    A    Yes.  I did observations, yes.
22    Q    Was it your advice to terminate
23  Mr. Smith?
24      MR. CHAKRAVORTY:  Objection as to

Page 48

1  form.
2      THE WITNESS:  I do not know what
3    you mean.
4
5  BY MR. STRELKA:
6    Q    Did you advise Mr. Henderson that
7  Mr. Smith should be terminated?
8    A    The documents is what provided the
9  result.
10    Q    Did you ever verbally speak with
11  Mr. Henderson regarding your recommendation for
12  Mr. Smith's job status after he was put on the LMS
13  achievement plan?
14    A    No.
15    Q    You never discussed whether you
16  felt he should be terminated or not?
17    A    No.  I do not recall that.
18    Q    Do you ever recall having a
19  discussion with any of your supervisors regarding
20  the termination of Carl Pernal?
21    A    No.
22    Q    What about Mr. Bandy?
23    A    No.
24    Q    It is your testimony then, like

Page 49

1  you said, that the documents speak for themselves?
2      A    Yes.
3      Q    Was Mr. Jack Daniels involved in
4  any way in the termination of Mr. Smith?
5      A    I am not sure.  I do not recall.
6      Q    Could he have been?
7          MR. CHAKRAVORTY:  Object as to
8      form.
9
10 BY MR. STRELKA:
11     Q    You still have to answer.  Could
12 he have been?
13     A    I guess.
14     Q    It is possible, but you don't
15 know?
16     A    Yeah.  I don't know.
17     Q    I do not want to try to put words
18 in your mouth.  Do you know how old Mr. Smith was?
19     A    No, I do not.
20     Q    Do you know if he is over the age
21 of 40?
22     A    Yes.
23     Q    Do you know if Mr. Smith has been
24 replaced at Advance Auto?

Page 50

1          MR. CHAKRAVORTY:  Objection as to
2      form.
3          THE WITNESS:  We have filled the
4      positions, yes.
5
6  BY MR. STRELKA:
7      Q    Do you know who filled his
8  position?
9      A    No, I did not.
10     Q    Do you know the age of anyone who
11 filled his position?
12     A    No, I do not.
13     Q    Same question, slightly different.
14 Do you know if anyone who filled Mr.
15 Smith's position was younger than Mr. Smith?
16         MR. CHAKRAVORTY:  Objection as to
17     form.
18         THE WITNESS:  Yes.
19
20 BY MR. STRELKA:
21     Q    I don't believe I asked you that
22 question with regard to Mr. Pernal.  Do you know if
23 Mr. Pernal has been replaced at Advance Auto?
24     A    Yes.

Page 51

1      Q    Do you know who replaced him?
2      A    No.
3          MR. CHAKRAVORTY:  Objection as to
4      form.
5
6  BY MR. STRELKA:
7      Q    Do you know the age of any
8  individual that has replaced Mr. Pernal?
9          MR. CHAKRAVORTY:  Object as to
10     form.
11         THE WITNESS:  No.
12
13 BY MR. STRELKA:
14     Q    Do you know if the individual or
15 individuals that have replaced Mr. Pernal were
16 younger than Mr. Pernal?
17         MR. CHAKRAVORTY:  Objection as to
18     form.
19         THE WITNESS:  Yes.
20
21 BY MR. STRELKA:
22     Q    But you don't know the age?
23     A    Right.  I can say they are younger
24 than me.

Page 52

1      Q    How old are you?
2      A    62.
3
4          (Deposition Exhibit Number 13
5          was marked for identification.)
6
7  BY MR. STRELKA:
8      Q    We have been talking about Homer
9  Smith.  Does he go also by the name Warren Smith?
10     A    Yes.
11     Q    Do you recognize the document that
12 has just been handed to you as Exhibit 13?
13     A    Yes.
14     Q    What is that document?
15     A    It is the final corrective
16 interview that was done on Warren.
17     Q    Just to make sure that the record
18 is clear here, anytime that you talk about Warren
19 you are referring to Homer Smith?
20     A    Yes.
21     Q    So Mr. Smith never had a -- other
22 than being placed upon the LMS achievement plan and
23 this team member action report, Mr. Smith never had
24 a work performance review that showed a deficiency

Page 53

1    in work product, did he?
2              MR. CHAKRAVORTY:  Objection as to
3        form.
4              THE WITNESS:  Not to my knowledge.
5
6    BY MR. STRELKA:
7        Q     Let me rephrase that because of
8    the objection.  Do you know if Mr. Smith ever
9    received a work performance evaluation that showed
10   a deficiency in work product?
11             MR. CHAKRAVORTY:  Objection as to
12       form.
13             THE WITNESS:  Not to my knowledge.
14
15   BY MR. STRELKA:
16       Q     Can you reconcile why Mr. Smith
17   and Mr. Pernal were terminated for work
18   performance, yet they never received any work
19   performance evaluations showing any deficiency of
20   work product?
21       A     Because we didn't always have
22   standards.  Everyone has a requirement of what they
23   need to do, expectations.  We have expectations to
24   meet.

Page 54

1        Q     When you said standards earlier,
2    are you referring to specifically the scanning, or
3    are you referring to just standards in general?
4        A     To the RF, the use of the RF.
5        Q     The RF scanner?
6        A     Yes.
7        Q     So you are saying that at the time
8    that Mr. Smith's and Mr. Pernal's work performance
9    evaluations were performed, the RF scanner was not
10   utilized at that time?
11       A     Right.  Ask me that again.
12       Q     The RF scanner, the standard as
13   you said, was that being utilized by Mr. Smith and
14   Mr. Pernal at the time of their work performance
15   evaluations?
16       A     The yearly evaluations?
17       Q     Yes.
18       A     It would have depended on what
19   year that you were just talking about.
20       Q     Well, let's talk about 2009.  You
21   just saw on Exhibit 12 a 2009 evaluation of
22   Mr. Pernal.  That was Exhibit 12.  If you want to,
23   you can go in here and look at it.  It is in the
24   stack.

Page 55

1              Was the RF scanner being utilized
2    by Mr. Pernal in 2009?
3        A     I am not sure.  I am not sure of
4    the date of when we got our standards -- our
5    expectations.
6        Q     So you don't know if it was 2009
7    or 2008 at all?
8        A     No.  I don't recall the date.
9        Q     Staying with Exhibit 12, that was
10   the 2009 performance management worksheet for Carl
11   Pernal.  Did you have a hand in the creation of
12   this document?
13             MR. CHAKRAVORTY:  Objection as to
14       form.
15             THE WITNESS:  Yes.
16             MR. CHAKRAVORTY:  Hold on a
17       second.  What do you mean by creation?
18       Like actually do the document --
19             MR. STRELKA:  I am asking her to
20       describe whatever that --
21             MR. CHAKRAVORTY:  Ask her --
22             MR. STRELKA:  Yeah.
23
24   BY MR. STRELKA:

Page 56

1        Q     Please detail whatever input you
2    had into the creation of this document, whatever --
3        A     Greg and I would sit down and
4    discuss each team member on how -- different areas
5    of the job that they had done.
6        Q     Was that for every performance
7    management worksheet that was created for these
8    workers in the reclamation department?
9        A     Yes.
10       Q     And do you recall indicating in
11   2009 whether Mr. Pernal had any deficiencies on the
12   RF scanner?
13       A     No, I do not.
14       Q     Do you recall in 2008 advising
15   Mr. Henderson of any deficiencies that Mr. Pernal
16   would have with the RF scanner?
17             MR. CHAKRAVORTY:  Objection as to
18       form.
19             THE WITNESS:  I don't know that he
20       was there in 2008.  I don't recall.
21
22   BY MR. STRELKA:
23       Q     Do you recall bringing it to
24   anyone's attention in 2008 at Advance Auto of any

Page 57

1   deficiency in work product based upon the use of
2   the RF scanner for Carl Pernal?
3       A    No.
4       Q    The same question, but for Warren
5   Smith.
6       A    In?
7       Q    Do you recall discussing any
8   workplace work performance deficiencies regarding
9   the RF scanner from Homer Warren Smith in 2008?
10      A    No.
11      Q    What about 2009 for Mr. Smith?
12      A    I don't recall.
13      Q    Do you remember if either of them
14  had any deficiencies in 2008 or 2009 with the RF
15  scanner?
16      A    I do not recall.
17      Q    Do you recall if Mr. Bandy had any
18  deficiencies with the RF scanner?
19      A    No.
20      Q    Have you ever indicated to one of
21  your supervisors in the course of the drafting of a
22  performance management worksheet any employee
23  having deficiencies with the RF scanner?
24      A    No.

Page 58

1       Q    You have never mentioned that to
2   any supervisor?
3       A    No.
4       Q    Why is that?
5       A    The RF scanner is very user
6   friendly.
7       Q    Okay.  But certain employees had
8   difficulty with it; isn't that right?
9       A    Well, a lot of times seeing the
10  screen if you didn't wear your glasses, that seemed
11  to be the biggest issue, but they are very user
12  friendly.
13      Q    The RF scanner is used to track,
14  as we talked about earlier, the time that a certain
15  employee may spend on a given objective at work; is
16  that right?
17      A    That is how we process our
18  product, yes, keep track of our inventory.
19      Q    So you have never discussed a
20  deficiency regarding that issue with any supervisor
21  for any employee at Advance Auto?
22      A    I do not recall that, no.
23
24          (Deposition Exhibit Number 14

Page 59

1           was marked for identification.)
2
3   BY MR. STRELKA:
4       Q    You have just been handed a
5   multi-page document that begins with a BATES label
6   of 816 and concludes at BATES label 825.  It has
7   been labeled Exhibit 14.  Do you recognize this
8   document?
9       A    Yes.
10      Q    What is this document?
11      A    This was the review form that was
12  used for a material handler, evaluation forms.
13      Q    Who was this particular form used
14  for?
15      A    Warren Smith.
16      Q    Was this for the year of 2008?
17      A    I would have to look at the date.
18  This would be 2007.
19      Q    2007.
20          MR. CHAKRAVORTY:  Hold on one
21  second.  I think there are two documents.
22  One is for 2007 and one is for 2008, I
23  think.
24          THE WITNESS:  Yeah, they are.

Page 60

1           MR. CHAKRAVORTY:  The first three
2   deal with 2007.
3           MR. STRELKA:  You are correct.  I
4   apologize.  I am going to make note on
5   the record.  But pending no objection
6   from you, I would like to kind of take
7   apart this exhibit.
8
9   BY MR. STRELKA:
10      Q    If I may see your exhibit, ma'am.
11  Here you go.  Now, I reflect to you right now that
12  I have just handed you the first three pages of
13  that document that I originally handed to you,
14  which has been labeled Exhibit 14 and that this
15  document has been BATES labeled 816 through 818.
16      A    Yes.
17      Q    And I'm sorry to repeat ourselves.
18  Can you identify this document?
19      A    Could you repeat that?
20      Q    Can you identify this document?
21      A    Yes.  It is a team member
22  evaluation form.
23      Q    For Mr. Smith?
24      A    Yes, sir.

Page 61

1   Q   For what year would this form have
2   evaluated him?
3   A   2007.
4   Q   Who is Greg Huddleston?
5   A   Greg Huddleston?
6   Q   Do you know a Greg Huddleston?
7   A   Yes.  He works in the reclamation
8   department.
9   Q   Does he still work there?
10  A   Yes.
11  Q   Do you know a Maggie Schneider?
12  A   Yes.
13  Q   What does she do?
14  A   She's a general warehouse worker
15  in the reclamation department.
16  Q   Are you aware of any hostile
17  exchange between those two workers?
18  A   Hostile?  No.
19  Q   Are you aware of any sort of
20  altercation between those two workers?
21  A   Just one telling the other one,
22  Don't tell me what to do.  No loud outburst that I
23  heard.
24  Q   Do you recall when the incident

Page 62

1   you are describing occurred?
2   A   No.  I mean, not the date.
3   Q   Do you recall any incident
4   relative to what I was just talking about, an
5   exchange between the two, occurring in 2010?
6   A   Only what I was told.
7   Q   Let me go ahead and get in the
8   other half of this document.
9
10      (Deposition Exhibit Number 15
11      was marked for identification.)
12
13  BY MR. STRELKA:
14  Q   Do you see this document?  This
15  was previously erroneously part of Exhibit 14.  Now
16  it is its own exhibit, Exhibit 15.  Do you
17  recognize this document?
18  A   Yes, sir.
19  Q   What is this document?
20  A   It is the annual performance sheet
21  for Warren Smith.
22  Q   For what year was this sheet --
23  A   2008.
24  Q   Thank you.  I appreciate you

Page 63

1   answering my question.  I would ask that you allow
2   me to finish the question before you answer, okay?
3   A   Yes.
4   Q   You are doing wonderful.  I
5   appreciate it.
6       From the document, it seems that
7   the only deficiency in 2008 for Mr. Smith was an
8   attendance matter.  Do you see that?
9   A   Yes.
10  Q   Do you recall any other
11  deficiencies in 2008 for Mr. Smith?
12  A   Any other?
13  Q   Do you recall any other work
14  performance deficiencies that Mr. Smith may have
15  had in 2008 other than attendance?
16  A   No.
17  Q   As in the other we discussed
18  earlier, you had discussed your observances of
19  Mr. Smith's work performance in 2008 to your
20  supervisor, who then created this; is that right?
21  A   Yes.
22
23      (Deposition Exhibit Number 16
24      was marked for identification.)

Page 64

1
2   BY MR. STRELKA:
3   Q   I am going to be handing you a
4   very large document now, and we are going to be
5   kind of going through it briefly.
6       Now, you have just been handed a
7   number of documents that are BATES labeled 1370
8   through 1391 as Exhibit 16, and there is a whole
9   bunch of stuff to look at in here.
10      I am going to go ahead and
11  represent to you that these documents collectively
12  represent incidences of hostility or workplace
13  violence or workplace aggression, okay?  That is
14  the theme we are going for, and that is why they
15  are all bundled together, okay?
16      I would like you to take a look at
17  the first page, what has been BATES labeled 1370.
18  Do you recognize this document?
19  A   I have never seen this one before.
20  Q   Is this a team member action
21  report?
22  A   Yes.
23  Q   If I told you that this was a team
24  member action report for John King created as a

Page 65

1  result of the altercation between Mr. Bandy and
2  Mr. King, would you doubt that?
3      A    No.
4      Q    Let's look at the next one. Do
5  you see the name at the top of that?
6      A    Yes.
7      Q    Who is Rodney Heptinstall?
8      A    I do not know him.
9      Q    Do you know if he is an employee
10 at Advance Auto at all or was an employee at
11 Advance Auto?
12     A    He was, yes.
13     Q    Do you recall an incident in which
14 he threatened to punch someone in the face?
15     A    No.
16     Q    Do you recall any incident
17 involving Mr. Heptinstall regarding any workplace
18 violence or hostility?
19     A    No.
20     Q    I would like you to look at what
21 has been BATES labeled as 1376. Do you see that?
22     A    Yes.
23     Q    What is this document?
24     A    It is a statement concerning a

Page 66

1  team member.
2      Q    Is it an e-mail?
3      A    Yes.
4      Q    Who is this from?
5      A    Jack Daniels.
6      Q    This was sent to -- do you see the
7  name, subject, Ricky Weeks?
8      A    Yes.
9      Q    Who is Ricky Weeks?
10     A    I do not know.
11     Q    Do you know if Ricky Weeks worked
12 for Advance Auto?
13     A    At one time.
14     Q    Do you know if Ricky Weeks was
15 ever involved in any sort of physical altercation
16 with anyone at Advance Auto?
17     A    I do not know.
18     Q    You have never heard of Mr. Weeks
19 pushing an employee or making threats?
20     A    No.
21     Q    I would like to have you look at
22 what has been BATES labeled Exhibit 1378. I'm
23 sorry, my dyslexia kicked in. It is not 1378 I
24 want you to look at. It is 1387.

Page 67

1          I am now representing to you that
2  in front of you is a document labeled team member
3  action report. Have you ever seen this document
4  before?
5      A    Not this particular document.
6      Q    But this is the same form that all
7  the team member action reports are generated from;
8  is that right?
9      A    Yes.
10     Q    Do you know of an employee named
11 Ferron Wade?
12     A    I knew of him.
13     Q    What did you know of him?
14     A    I knew that he worked on third
15 shift and that his mother worked there.
16     Q    Do you know if Mr. Wade was
17 involved in any physical altercation or hostility
18 at the workplace?
19     A    I had heard that.
20     Q    What had you heard?
21     A    That he had thrown something and
22 broke another team member's -- chipped another team
23 member's tooth.
24     Q    Do you know what he threw?

Page 68

1      A    No, I do not.
2      Q    Were you involved in any way in
3  any discipline of Mr. Wade?
4      A    No.
5      Q    I would like you to flip the page,
6  and I will represent to you you are now looking at
7  what has been BATES labeled 1388. Do you see the
8  name at the top of that?
9      A    Yes, sir.
10     Q    Do you know an Allen Ragland?
11     A    I do.
12     Q    How do you know Allen Ragland?
13     A    He worked at Advance Auto Parts.
14     Q    Do you know of any physical
15 altercation or hostility that he may have exhibited
16 at the workplace?
17     A    Only what I heard.
18     Q    What did you hear?
19     A    That he made a threat to come and
20 kill some of the people here at Advance.
21     Q    Who did you hear that from?
22     A    Another -- I don't recall the name
23 of the person. I really don't.
24     Q    Where it says manager's signature,

Page 69

1  do you know whose signature that is?
2      A    No, I do not.
3      Q    But below that you see witness
4  signature?
5      A    Yes.
6      Q    Who is that signature?
7      A    Jack Daniels.
8      Q    Do you recall any other incidents
9  of workplace violence at Advance Auto other than
10 the ones that we have just discussed?
11     A    I do recall one involving two team
12 members years ago.  They got into an altercation of
13 threatening to hit each other, and they were both
14 terminated.  I do not remember the year.
15     Q    Do you remember the name?
16     A    Steve Gravely and Richard
17 Christian.
18     Q    When did you say you began working
19 for Advance Auto?
20     A    1990.
21     Q    Do you recall if this incident
22 occurred after the year 2000?
23     A    I do not recall.
24     Q    Do you know where those

Page 70

1  individuals worked?
2      A    In the receiving department.
3          MR. STRELKA:  I am getting very
4      close to concluding.  Let me just kind of
5      review this one document here.
6          MR. CHAKRAVORTY:  Sure.
7
8  BY MR. STRELKA:
9      Q    Do you know what a rank order
10 attendance report is?
11     A    A rank?
12     Q    It may sometimes be referred to as
13 a ROAR?
14     A    ROAR report?
15     Q    ROAR report?
16     A    Yes.
17     Q    Okay.  What is a ROAR report?
18     A    It is the report that comes out at
19 the end of each quarter, period, every three
20 months.
21     Q    What information does that report
22 contain?
23     A    That tells you if you have a team
24 member that -- the hours they were expected to work

Page 71

1  and hours they missed and if they failed to meet
2  the hours estimated.
3      Q    So as the name would suggest, this
4  report supplies information regarding the
5  attendance of an employee of Advance Auto?
6      A    Yes, that did not have a benefit
7  to cover their absence.
8
9          (Deposition Exhibit Number 17
10         was marked for identification.)
11
12 BY MR. STRELKA:
13     Q    You have just been handed a
14 document that has been labeled Exhibit 17.  Do you
15 recognize this document?
16     A    Yes.
17     Q    What is this document?
18     A    It is how our ROAR report works,
19 our attendance policy works.
20     Q    It says, Attendance policy revised
21 April 25, 2010.  Is it your understanding that this
22 was the attendance policy addendum that was in
23 place at that time?
24     A    Yes.

Page 72

1      Q    On the second page, you will
2  notice a signature.  Do you recognize that
3  signature?
4      A    Yes.
5      Q    Is that Roger Bandy's signature?
6      A    Yes, sir.
7      Q    Do you know, did Mr. Bandy ever
8  have a problem with attendance?
9      A    No.
10     Q    Did Mr. Bandy ever have a problem,
11 from your observations, regarding any area of work
12 performance?
13     A    No.
14     Q    So he was a good worker?
15     A    He was.
16     Q    Did you ever have any
17 conversations with Mr. Henderson about who would
18 and who wouldn't be terminated from the reclamation
19 department?
20         MR. CHAKRAVORTY:  Objection as to
21     form.
22         THE WITNESS:  In regard to?
23
24 BY MR. STRELKA:

Page 73

1    Q    I will strike that.  Did you ever
2  have -- how do I say this?  Did Mr. Henderson ever
3  ask you for your input regarding the termination of
4  an employee at Advance Auto?
5    A    My input really doesn't determine
6  whether a team member gets terminated.  It is --
7  you know, the policies are in place, so -- you
8  know.
9    Q    I understand that, but did he ever
10  ask you?
11    A    I don't recall.
12    Q    Did you ever hear Mr. Henderson
13  comment upon wishing to terminate older employees
14  at Advance Auto?
15    A    No.  I would find that very
16  offensive.
17
18        (Deposition Exhibit Number 18
19        was marked for identification.)
20
21
22  BY MR. STRELKA:
23    Q    You have been handed a document
24  marked Exhibit 18.  Do you recognize this document?

Page 74

1    A    Yes.
2    Q    What is this document?
3    A    It is our tobacco policy.
4        MR. CHAKRAVORTY:  Hold on a second
5    here.  There are two pages to it.
6        MR. STRELKA:  I don't know why
7    that is on here.
8        MR. CHAKRAVORTY:  Do you want to
9    amend it like before?
10        MR. STRELKA:  I do wish to amend
11    it.  Let's split this up.
12
13  BY MR. STRELKA:
14    Q    I apologize again for this.  I am
15  now handing you a document which is a one-page
16  document that is labeled Exhibit 18, BATES labeled
17  80.  Do you recognize this single-page document?
18    A    Yes.  It is our tobacco policy.
19    Q    And whose signature is at the
20  bottom of the document?
21    A    Mr. Bandy.
22    Q    It has been dated April 19, 2010.
23  Do you see that?
24    A    Yes, sir.

Page 75

1    Q    Is it your understanding that this
2  was the tobacco policy in place at Advance Auto in
3  2010?
4    A    Yes.
5
6        (Deposition Exhibit Number 19
7        was marked for identification.)
8
9  BY MR. STRELKA:
10    Q    Have you seen this document?
11    A    Yes, sir.
12    Q    Do you know what this document is?
13    A    Yes.
14    Q    What is this document?
15    A    It is our United Way form that we
16  give to team members to fill out if they want to
17  donate to United Way.
18        MR. STRELKA:  Ms. Myers, I
19    appreciate all of your earnest answers
20    here today, and we should be very close
21    to wrapping up.  If you would just allow
22    me to look -- give me a minute or two to
23    look through my notes and see if there is
24    anything else I wish to ask you.

Page 76

1        THE WITNESS:  Yes, sir.
2
3        (Discussion off the record.)
4
5  BY MR. STRELKA:
6    Q    We are now back on the record.
7  Ms. Myers, you understand you are still under oath?
8    A    Yes.
9    Q    Are you familiar with how an
10  employee is trained to use the RF scanner in the
11  reclamation department?
12    A    Yes.
13    Q    How is an employee trained to use
14  the RF scanner in the reclamation department?
15    A    We have a trainer, a team member,
16  that has been designated as our trainer who works
17  with the team member.
18    Q    Do you know how long it takes to
19  complete that training?
20    A    We allow about ten days.
21    Q    And as part of his job duties when
22  he was in the reclamation department, Mr. Smith had
23  to use that RF scanner?
24    A    Yes.

Page 77

1    Q    Do you know if Mr. Smith ever
2  suffered from any health condition while at Advance
3  Auto?
4    A    No.
5    Q    I am going to represent to you
6  that he signed an affidavit in this case in which
7  he said he suffers from arthritis.
8         Did you ever know Mr. Smith to
9  suffer from arthritis?
10   A    No.
11   Q    Did he ever complain to you about
12 that?
13   A    No.
14   Q    Did he ever complain to you about
15 the amount of training he received on the RF
16 scanner?
17   A    No.
18   Q    Do you know if Mr. Smith received
19 the same amount of training on the RF scanner as
20 other employees?
21   A    He did.
22   Q    So he didn't receive any less
23 training than anyone else?
24   A    No.

Page 78

1    Q    Do you know if Mr. Smith ever
2  requested to be transferred out of the reclamation
3  department?
4    A    Not to my knowledge.
5    Q    Do you know if he -- well, you say
6  not to your knowledge.  That is sufficient.
7         Do you know if Mr. Pernal ever
8  requested to be transferred out of the reclamation
9  department?
10   A    Not to my knowledge.
11   Q    What about Mr. Bandy?
12   A    No, not to my knowledge.
13   Q    Can you describe to me where the
14 callback department is?  Is that the reclamation
15 department?
16   A    Yes.
17   Q    What type of work is done in the
18 callback department?
19   A    That is product coming back from
20 the stores that is going to be returned to the
21 vendors.  It is brand new product.
22   Q    Do people in the callback
23 department utilize an RF scanner?
24   A    Yes.

Page 79

1    Q    Is there any area of the
2  reclamation department that would require more use
3  of the RF scanner as a necessary component of the
4  job than other areas?
5    A    Yes.
6    Q    What would that be?
7    A    Well, we have multiple areas, but
8  no one -- you know, we have our overstocks, our
9  defects, and our cores that all require a lot of --
10 require RF work.
11   Q    So all those departments that you
12 just named require frequent use of the RF scanner?
13   A    The areas, yes.  They are not
14 departments.
15   Q    I apologize.
16   A    That is okay.
17   Q    In the course of this lawsuit,
18 Mr. Pernal and Mr. Smith, I represent to you, have
19 submitted affidavits in this case claiming that
20 they were transferred to the defect section and
21 that they were working in the defect section and
22 only in the defect section.
23        Is that accurate or is that
24 inaccurate according to your personal observation?

Page 80

1    A    Who was this?
2    Q    Mr. Pernal and Mr. Smith.
3    A    That is not accurate.
4    Q    You are saying that they never
5  worked just in the defect section?
6    A    No, they did not.
7    Q    Earlier you had testified
8  regarding Mr. Pernal's transfer from operating the
9  gate to the reclamation department, correct?
10   A    Yes.
11   Q    Do you know if he received any
12 change in pay pursuant to that transfer?
13   A    I do not know.
14   Q    Do you know if there was any
15 change in his benefits pursuant to that transfer?
16   A    I do not know.
17   Q    Earlier I said that Mr. Pernal was
18 working as a security guard, and you told me that
19 that maybe wasn't accurate; is that right?
20   A    That's right.
21   Q    Do you know what Mr. Pernal's
22 title was at that gate?
23   A    I do not know.
24   Q    Would a transfer from where he was

Page 81

1    working to the reclamation department be considered
2    a demotion?
3         A    I am not sure. I do not know.
4         Q    It is possible that it could have
5    been?
6              MR. CHAKRAVORTY:  Objection as to
7    form.
8              THE WITNESS:  I guess.
9
10   BY MR. STRELKA:
11        Q    Mr. Pernal's previous job at the
12   gate, did that job require any lifting?
13        A    Not to my knowledge.
14        Q    I am going to represent to you
15   that in an affidavit submitted in the course of
16   this lawsuit, Mr. Pernal indicated that, according
17   to him, he observed older individuals such as
18   himself, Mr. Smith, and Mr. Bandy, to be given more
19   difficult jobs in the reclamation department while
20   younger workers were given easier jobs, less
21   physically demanding.  Would you agree with that
22   observation?
23        A    No, I do not.
24        Q    Do you disagree with it in its

Page 82

1    entirety?
2         A    Yes.
3         Q    In the course of your employment
4    with Advance Auto, are you aware of anyone being
5    transferred to the reclamation department in order
6    that they may be terminated?
7         A    No.
8              MR. CHAKRAVORTY:  Objection as to
9    form.
10             MR. STRELKA:  I have no further
11   questions at this time.  Thank you.
12             MR. CHAKRAVORTY:  I have some.
13
14             EXAMINATION
15
16   BY MR. CHAKRAVORTY:
17        Q    Thanks for being here.  Against my
18   better judgment and against my mom's wishes, could
19   you please tell me your birth date.
20        A    July 23, 1950.
21        Q    I want to ask you some of the
22   questions that Mr. Strelka asked you and try to get
23   some more background.  Let's talk about these
24   departments that Mr. Strelka talks about.  You said

Page 83

1    they were areas, correct?
2         A    Yes.
3         Q    So the department is the
4    reclamation department, and then you have certain
5    areas in that department?
6         A    Yes.
7         Q    And I think you said cores,
8    overstock, defects, breaking down trucks.  There
9    are various areas.
10        A    Yes.
11        Q    And I just want to make sure I
12   understand.  Your testimony is every general
13   warehouse worker is cross-trained so they go to
14   different areas, correct?
15        A    Yes.
16        Q    When they go from one area to
17   another, let's say from cores to defect or defect
18   to callback, is there a change in rate of pay?
19        A    No.
20        Q    Have you heard any employee
21   complain about being sent to defect so Advance
22   could fire them?
23        A    No.
24        Q    Have you heard any employee

Page 84

1    complain to you or believe that the defect section
2    is less desirable than any other section or area of
3    the reclamation department?
4         A    No.
5         Q    You testified about Cassandra
6    Hall.  Her nickname is Sandy, correct?
7         A    Yes.
8         Q    She is a general warehouse worker?
9         A    Yes, she is.
10        Q    She came to you on October 13,
11   2010, and she reported an incident to you, correct?
12        A    Yes.
13        Q    Exactly what did she report?
14        A    That she had heard Mr. Bandy and
15   Mr. King arguing.  She heard the loudness.  She
16   looked up.  She seen Mr. Bandy shaking his fist.
17        Q    I think you also said that she
18   seemed scared or nervous?
19        A    She was very nervous.  Her hands
20   were shaking.  It really shook her up.
21        Q    And so you said right after that
22   you went to Greg Henderson?
23        A    Yes, I did.
24        Q    Did you have any other role in the

Page 85

1 decision to terminate Mr. Bandy or Mr. King?
2     A   None at all.
3     Q   Do you know about Advance's
4 workplace violence policy?
5     A   Yes.
6     Q   To your knowledge, what is that
7 policy?
8     A   Zero tolerance for threatening and
9 intimidation.
10     Q   To your knowledge, does there have
11 to be actual physical contact for the policy to be
12 effectuated?
13     A   No.
14     Q   So if the threat is made, that is
15 still a violation of the policy to your
16 understanding?
17     A   Yes.
18     Q   Is that what you tell your
19 employees?
20     A   Yes, it is.
21     Q   How would an employee know about
22 the workplace violence policy?
23     A   It is covered, and they also have
24 signed a paper.

Page 86

1     Q   Is it in the handbook?
2     A   Yes.
3     Q   Do you know if Mr. Bandy received
4 a copy of the handbook?
5     A   Yes.
6     Q   What is your understanding of zero
7 tolerance?
8     A   That if there is an incident
9 involving the team member or a team member and
10 management or two people, that someone is
11 threatened or they are afraid, feel like they are
12 unsafe, that that is not allowed.
13     Advance assures us that we are
14 going to come into a safe and not a hostile
15 environment.
16     Q   Has Advance had a problem in the
17 past with a workplace shooting?
18     A   They did have one.
19     Q   From your own personal
20 perspective, do you understand why Advance has a
21 zero tolerance policy on workplace violence?
22     A   I do.
23     Q   What is your understanding?
24     MR. STRELKA:  Objection to

Page 87

1 relevancy.  Go ahead and answer.
2     THE WITNESS:  My understanding is
3 that we need to feel safe and that we are
4 not going to -- we don't go around
5 threatening and intimidating people.
6
7
8 BY MR. CHAKRAVORTY:
9     Q   Would it be correct to say that if
10 you don't take action, someone could come back
11 after the fact and effectuate real violence?
12     MR. STRELKA:  Object to
13 speculation.
14     THE WITNESS:  I do.
15
16 BY MR. CHAKRAVORTY:
17     Q   You are aware of what happened,
18 for example, a week and a half ago in Colorado?
19     A   Yes.
20     Q   You are aware of other incidents
21 -- not necessarily Colorado was workplace violence,
22 but you have seen the news where people have come
23 back to the workplace and effectuated violence,
24 hurting people, killing people?

Page 88

1     MR. STRELKA:  Objection.
2     THE WITNESS:  Yes.
3
4 BY MR. CHAKRAVORTY:
5     Q   That is what, to your knowledge,
6 the workplace violence policy protects?
7     A   Yes.
8     Q   To your knowledge, does it matter
9 if an employee is a great employee for 40 years if
10 they violate that policy?  Is they are in violation
11 of the workplace violence policy, is it your
12 understanding it doesn't matter how many good years
13 of service you have had, that you are going to get
14 terminated?
15     A   Yes.
16     Q   Because of zero tolerance?
17     A   Yes, sir.  That is my
18 understanding.
19     Q   Has anyone in management higher
20 than you told you anything different or suggested
21 anything different?
22     A   No.
23     Q   Do you know of anyone who has made
24 a threat of violence or actual violence who hasn't

Page 89

```
 1   been terminated by Advance?
 2        A   No, I do not.
 3        Q   You talked about the situation or
 4   Mr. Strelka asked about the situation of
 5   Mr. Huddleston and Maggie Schneider, I believe?
 6        A   Yes.
 7        Q   Was it your understanding from
 8   what you know that that was in violation of the
 9   workplace violence policy?
10        A   No.
11        Q   Why?
12        A   From what I was told, one was just
13   telling the other one, Don't tell me what to do.
14   It was not no threat.  You are not my boss.
15        Q   Did any employee come to you like
16   Cassandra Hall came to you and said, I was scared,
17   by what they witnessed between Maggie Schneider and
18   Mr. Huddleston?
19        A   No one.
20        Q   Do you know if any employee came
21   to anyone else in management about what they may
22   have observed between Maggie Schneider and
23   Mr. Huddleston?
24        A   No, I do not.
```

Page 90

```
 1        Q   Mr. Strelka asked you the question
 2   have you ever heard Greg Henderson make any
 3   comments about age or his disdain for older people,
 4   and I think your answer was no; is that correct?
 5        A   That's correct.
 6        Q   Have you heard any other manager
 7   at Advance make such a statement?
 8        A   No, I have not.
 9        Q   You also stated that you found
10   that offensive if that statement had been made?
11        A   If it had been made, I would have.
12        Q   Why?
13        A   Because I would fall in that
14   category, and I would take it personal.
15        Q   Assume you heard that statement.
16   What would you do?
17        A   I would go to Jack Daniels, the
18   operation manager.
19        Q   Why would you do that?
20        A   Because I would be offended, and
21   it should not be made.  We have -- we are equal
22   opportunity.
23        Q   By the way, just going back, from
24   the time that we took the break, we were off
```

Page 91

```
 1   record, have I spoken to you about any of these
 2   questions?
 3        A   No.
 4        Q   In fact, I haven't even talked to
 5   you since I started asking you questions, correct?
 6        A   Correct.
 7        Q   Let's talk about Mr. Pernal.  I
 8   think you said Mr. Pernal, before he was in the
 9   reclamation department, worked in the gate.
10        A   Yes.
11        Q   And I think you also said in
12   response to a question, which I objected to, that
13   him moving from the gate to the reclamation
14   department could have been a demotion?
15        A   It could have been.  I am not
16   sure.
17        Q   You don't know?
18        A   I don't know.
19        Q   Is it your understanding that the
20   gate, that area, was initially staffed by employees
21   who were employed by Advance?
22        A   Yes.
23        Q   Is it your understanding that at
24   some point Advance decided that they were no longer
```

Page 92

```
 1   going to employ those people, that it was going to
 2   be outsourced to a third party?
 3        A   Yes.
 4        Q   So once the outsourcing occurred,
 5   is it your understanding that Mr. Pernal and others
 6   that were working in security or at the gate would
 7   have had to work for this other outside entity if
 8   they were to have hired them?
 9        A   Yes.
10        Q   But is it your understanding that
11   Mr. Pernal chose an offer to come and still be an
12   employee at Advance?
13        A   Yes.
14        Q   Do you know anything about whether
15   he chose to come into the reclamation department at
16   all?
17        A   I do not know.
18        Q   Do you know if seniority played
19   any role in his coming to the reclamation
20   department?
21        A   I do not know.
22        Q   Do you know if, for example, he
23   was the most senior person, and because he was the
24   most senior, he got the first opportunity of where
```

Page 93

1    he wanted to come into Advance?  Would you know if
2    that's true or not?
3         A    I do not know.
4         Q    Would you know if, in fact, what I
5    said was true, that he was the most senior, that he
6    decided where he wanted to go, and he decided to go
7    to the reclamation department?  Do you know if that
8    is true or not?
9         A    I do not know.
10        Q    And you do not know, when
11   Mr. Pernal was working at the gate and that job was
12   going to be lost because it was going to be
13   outsourced, whether the new vendor, the new company
14   that was going to provide the security, what their
15   pay was going to be or what their benefits were
16   going to be?
17        A    I do not know.
18        Q    Mr. Strelka put in a series of
19   documents that were performance evaluations, some
20   for Mr. Pernal, a couple for Mr. Bandy, a couple
21   for Mr. Smith.
22             For example, Exhibit 10 here.  Let
23   me pull these out real quick.  Ms. Myers, if you
24   would -- and you can use these.  They are the same.

Page 94

1             MR. CHAKRAVORTY:  Is that all
2    right, Tom?
3             MR. STRELKA:  Yes.
4    BY MR. CHAKRAVORTY:
5         Q    If you would look at Exhibits 10,
6    12, 14, and 15, okay?
7         A    Okay.
8         Q    I think you have already testified
9    to what they are, and the record reflects some of
10   them are performance evaluations, yearly
11   evaluations, for different people, correct?
12        A    Correct.
13        Q    On some of these, for example, I
14   think 10 and 15 and -- maybe not 10.  Maybe 12 and
15   15, your signature -- well, not on 15.  Let me back
16   up.
17             Did you sign any of these
18   documents, to your knowledge?
19        A    Not to my knowledge.
20        Q    Did you have any role in these
21   documents?
22        A    Just in reviewing the team members
23   before he typed them up.

Page 95

1         Q    Did you have any input with -- who
2    typed it up?
3         A    Greg.
4         Q    Who did the evaluation?
5         A    Greg Henderson.
6         Q    And you had input with Greg?
7         A    Yes.
8         Q    So these type of performance
9    evaluations, 10, 15, 14, and 12, that is a
10   subjective view of what you believe a person is
11   performing, correct?
12        A    Correct.
13        Q    So both you and Greg Henderson
14   think that Mr. Bandy or Mr. Pernal or Mr. Smith are
15   performing well?
16        A    Correct.
17        Q    Subjective, correct?
18        A    Correct.
19        Q    Now, let's look at this real
20   quick.  Let's look at Exhibit 11, which are the
21   PIPs that we were talking about, performance
22   improvement plans, the LMS, I believe?
23        A    Yes, the PIPs, yes.
24        Q    There are a couple others in

Page 96

1    there, one dealing with Mr. Pernal and one dealing
2    with Mr. Smith.  And if you look at it, there are
3    percentages.  It talks about how the person is not
4    meeting a percentage.  Do you see that?
5         A    Yes.
6         Q    Where do those percentages come
7    from?
8         A    They are from the assignment that
9    the team member was doing while we observed them.
10        Q    For example, in Document 11 you
11   see where it says that on 2/27/2010 he apparently
12   was 63 percent, or that was his efficiency rate; is
13   that correct?
14        A    Yes.
15        Q    That is what it indicates?
16        A    That is what it indicates.
17        Q    What do you typically want a team
18   member to be?
19        A    95 percent.
20        Q    So he was 32 percent below what
21   you expected?
22        A    Correct.
23        Q    Now, did the 63 percent come from
24   you?  I mean, are you and Greg Henderson

Page 97

1 subjectively sitting there going, It is 63 percent?
2    A    No.
3    Q    It is the computer, isn't it?
4    A    Correct.
5    Q    And the computer, to your
6 knowledge, doesn't know anyone's age?
7    A    No.
8    Q    So when you get that number, you
9 decide to put someone on a PIP not because of your
10 subjective evaluation of an individual, but it is
11 based on what the computer tells you what the
12 efficiency rate is, correct?
13    A    Correct.
14    Q    How do you get on a PIP?
15    A    When you fail to meet the standard
16 that is in place, our expectations.
17    Q    Is it on a four-week average
18 period?
19    A    Yes.
20    Q    So if the computer says based on
21 the numbers that the computer provides, it has
22 nothing to do with you or any other manager,
23 correct?
24    A    Correct.

Page 98

1    Q    So the computer provides a number.
2 If the computer spits out that over a four-week
3 period, it is under 95 percent, the person
4 automatically goes on PIP?
5    A    Yes.
6    Q    And then what happens once the
7 person gets on PIP?
8    A    We do observations.  And before
9 they are even put on the PIP, we are doing
10 observations on these team members.
11    Q    Why are you doing observations?
12    A    To coach them, to enhance their
13 performance, show them the good things, and what
14 they need to improve on.
15    Q    But you are not coming up with --
16 for example, in this document, Number 11, where it
17 says someone is performing at 63 percent or
18 whatever, you are not the one coming up with the
19 percentage?
20    A    No, I am not.
21    Q    It's the computer?
22    A    Correct.
23    Q    Once they are on a PIP, are they
24 given time to try to improve?

Page 99

1    A    Yes.
2    Q    How much time are they given?
3    A    They are given a six-week period.
4    Q    What happens if they don't
5 improve?
6    A    It leads to termination.
7    Q    You made a comment earlier that
8 the documents speak for themselves?
9    A    Correct.
10    Q    So when you are talking about the
11 documents speak for themselves, you are talking
12 about the fact that you have a policy in place,
13 right?
14    A    Correct.
15    Q    That if you don't meet a certain
16 goal, you are going to put on a PIP.  And then if
17 you still can't meet the goal, the efficiency rate,
18 you are going to get terminated?
19    A    Correct.
20    Q    Is that what happened with
21 Mr. Pernal and Mr. Smith?
22    A    Correct.
23    Q    It had nothing to do with your
24 subjective view of how the person was performing?

Page 100

1    A    Not at all.
2    Q    It had something to do with the
3 computer which is used by Advance to suggest as to
4 whether or not -- what they were coding in, I
5 guess; is that correct?
6    A    That's correct.
7    Q    By the way, on this one -- I think
8 this is Number 11, Exhibit 11 for Carl Pernal.  It
9 says final corrective interview, is that correct,
10 that document?
11    A    Yes.
12    Q    That is not the termination
13 document, is it?
14    A    No, it's not.
15    Q    So there would have been another
16 one.  He would have been put on an initial plan,
17 correct?
18    A    Yes.
19    Q    Because he couldn't meet the
20 numbers?
21    A    Right.
22    Q    Then he was given this corrective
23 interview, the document we are looking at, Number
24 11, because he still wasn't meeting the numbers,

Page 101

1    correct?
2        A    That's correct.
3        Q    Then he was still given more time
4    to improve before he was terminated, correct?
5        A    He had another week, yes, sir.
6        Q    If he had improved at any time
7    during this process, would he have been terminated?
8        A    No, if he had maintained an
9    increase showing that he was steadily getting up to
10   that 95 percent.
11       Q    So he could have improved his own
12   performance and saved his job?
13           MR. STRELKA:  Object to
14       speculation.
15           THE WITNESS:  Yes.
16
17   BY MR. CHAKRAVORTY:
18       Q    Just like anyone else?
19       A    Correct.
20       Q    Does this computer system, the
21   percentages, do you know if age is any factor in
22   that system?
23       A    It is not.
24       Q    So a person who is 20 or a person

Page 102

1    who is 80, if they are producing they are fine; if
2    they are not they are not.  Correct?
3        A    That's correct.
4        Q    Would it be fair to say that the
5    evaluations we looked at -- for example, 15, which
6    I think you have already said is subjective --
7        A    Correct.
8        Q    -- is different than the PIP,
9    which is objective in the sense that you are
10   dealing with hard numbers.  Would that be a correct
11   assessment?
12       A    That's correct.
13           MR. CHAKRAVORTY:  I don't have
14       anything further.
15
16           EXAMINATION
17
18   BY MR. STRELKA:
19       Q    I just have a very few, maybe just
20   one or two.  How many employees, Ms. Myers, work in
21   the reclamation department?
22       A    We have 32.
23       Q    During the day, during the
24   workdays, are those employees split equally among

Page 103

1    the different areas?
2        A    Not equally, no.
3        Q    Could you describe to me what
4    areas would require more employees than others?
5        A    It varies depending on what
6    product we are getting back.  It could be that we
7    need more in cores if the cores are being returned
8    heavy.  Overstock right now is really coming back
9    heavy, so it is requiring extra attention.  There
10   is times when callbacks are really hitting us that
11   we have to have extra manpower there.
12           So it is really on a daily basis
13   as to how we distribute the people.  I don't have a
14   set -- that I have five people here, five there.
15       Q    Who determines how the employees
16   are to be distributed in the reclamation
17   department?
18       A    I do.  On a daily basis my manager
19   and I go over our workload.
20       Q    And when you say your manager, who
21   are you referring to again?
22       A    My manager now is Nick Jones.
23       Q    And in 2009?
24       A    Greg Henderson.

Page 104

1        Q    2010?
2        A    Greg Henderson.
3            MR. STRELKA:  I hope you have a
4        good vacation.  Thank you.
5            MR. CHAKRAVORTY:  One last thing.
6        You have a chance to either read or waive
7        signature.  What that means is the court
8        reporter is great, but like me -- unlike
9        Tom, who never makes a mistake -- she may
10       not know a word.  I know she has been
11       asking you questions, how to spell
12       something.
13           You can read to make sure that
14       everything you have said is correct,
15       okay?  Or you can waive, which means you
16       trust that she is a good reporter.  The
17       choice is yours.  What I would recommend,
18       but the choice is yours, is that you read
19       it just to make sure.
20           THE WITNESS:  Okay.
21   (4:10 p.m.)
22           FURTHER THE DEPONENT SAITH NOT.
23
24

Page 105

```
 1
              WITNESS
 2
 3
 4
 5
            * * * * *
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 107

```
 1                  ERRATA SHEET
 2      DEPOSITION OF:  BARBARA MYERS
 3    IN THE MATTER OF: BANDY v. ADVANCE AUTO PARTS, INC
 4             JULY 24, 2012
 5    I have read the foregoing deposition and wish to
        make the following changes.
 6
      PAGE LINE  CHANGE        REASON FOR CHANGE
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23              _____
                        Witness
24
```

Page 106

```
 1          C E R T I F I C A T E
 2    COMMONWEALTH OF VIRGINIA
 3    CITY OF ROANOKE
 4        I, PATRICIA D. AHERN, RPR, Notary Public in
 5    and for the Commonwealth of Virginia, at Large, do
 6    hereby certify that the deposition of Barbara Myers
 7    was by me reduced to machine shorthand in the
 8    presence of the witness, afterwards transcribed by
 9    me by means of computer, and that to the best of my
10    ability the foregoing is a true and correct
11    transcript of the deposition so given as aforesaid.
12        I further certify that this deposition was
13    taken at the time and place specified in the
14    foregoing caption.
15        I further certify that I am not a relative,
16    counsel or attorney for either party, or otherwise
17    interested in the outcome of this action.
18        IN WITNESS WHEREOF, I have hereunto set my
19    hand at Roanoke, Virginia, on the 15th day of
20    August, 2012.
21
22             _____
               PATRICIA D. AHERN, RPR
23                 NOTARY PUBLIC
24    My Commission expires January 31, 2014.  # 165417
      I was commissioned as Patricia A. Brown
```

Page 108

```
 1
 2         CENTRAL VIRGINIA REPORTERS
               PO BOX 12628
 3            ROANOKE, VIRGINIA
               (540)380-5017
 4             August 15, 2012
 5    Dear Ms. Myers,

 6        At the time your deposition was taken it was
      indicated that you would like to exercise your
 7    right to read and sign the deposition transcript.
      Please do so at this time and make any changes or
 8    clarifications you deem appropriate.  However, do
      NOT write on the transcript from which you are
 9    reading.  Simply write the page and line number on
      the enclosed errata sheet along with any
10    corrections.
11        Upon completion, sign the errata sheet and
      the enclosed original signature page and return the
12    contents to Mr. Chakravorty.  It is important that
      you take care of this matter at your earliest
13    convenience.
14        If you have any questions, call me at the
      number indicated above.  Thank you for following
15    these instructions.
16    Sincerely,
17
18    Patricia D. Ahern, RPR
      Court Reporter
19
20
21
22
23
24
```

107

1                          ERRATA SHEET

2                 DEPOSITION OF:  BARBARA MYERS

3    IN THE MATTER OF: BANDY v. ADVANCE AUTO PARTS, INC.

4                        JULY 24, 2012

5    I have read the foregoing deposition and wish to
     make the following changes.
6
     PAGE LINE   CHANGE              REASON FOR CHANGE
7     34   12    Rexrode            Spelling incorrect

8     34   16    Rexrode            Spelling incorrect

9     34   22    Rexrode            Spelling incorrect

10

11

12

13

14

15

16

17

18

19

20

21

22        _Barbara V. Myers  8-20-12_
23                      Witness

24