IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

ROGER DEAN BANDY,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀**Case No. 7:11 CV365**
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
ADVANCE AUTO PARTS, INC.,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀)

## ADVANCE AUTO PARTS, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### STATEMENT OF THE CASE

On September 27, 2012, Defendant, Advance Auto Parts, Inc., filed a Motion for Summary Judgment ("Motion" ) under Rule 56 of the Federal Rules of Civil Procedure as to Plaintiff Roger Dean Bandy's ("Bandy") Complaint alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et. seq.* (See CM/ECF Document # 21.)[1] Advance's Motion was accompanied by a Memorandum in Support. (*See* CM/ECF Document # 22.)

On October 15, 2012, Bandy filed a Response to Advance's Motion and Memorandum in Support. (*See* CM/ECF Document # 23.) This Memorandum responds to the arguments raised by Bandy in his Response. Advance, however, reincorporates by reference, and relies on, all the arguments, evidence, and authorities as set forth in its

---

WOODS ROGERS PLC
ATTORNEYS AT LAW

[1]Bandy was not employed by Advance Auto Parts, Inc. as alleged in the Complaint. Rather, he was employed by its subsidiary Advance Stores Company, Incorporated (hereinafter referred to as "Advance").

Memorandum in Support.[2]

## ARGUMENT AND AUTHORITIES

**BANDY HAS NOT PROFFERED ANY EVIDENCE THAT AGE WAS *THE* REASON FOR HIS DISCHARGE IN ORDER TO AVOID SUMMARY JUDGMENT.**

**A.     General.**

The parties agree that in order to have an actionable claim under the ADEA Bandy

has to show that age was the reason for his discharge—*e.g.*, that "but for" his age he would

not have been terminated.  *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 180 (2009);

*compare* Advance Mem. at pp. 24-25 *with* Bandy Resp. at p. 2.[3]  The parties also concur that

Bandy can prove "but for" discrimination by either direct or circumstantial evidence of age

based animus.  *Id.*

Notwithstanding this, Bandy, in his Response, does not cite to even *one* case which

supports his assertion that he was the victim of intentional age discrimination, either via

direct or circumstantial evidence, *based on the specific facts which are before this Court.*

*See generally* Bandy Resp.[4]  Those undisputed facts, which warrant summary judgment for

Advance, are as follows: (1) Bandy was terminated by an individual, Mike Russell

("Russell"), who did not know Bandy or his age, and Russell was also in the class protected

by the ADEA; (2)  Russell based his decision on age neutral factors—*i.e.*, independent

---

[2]Advance's Memorandum in Support of its Motion for Summary Judgment will be hereinafter cited as "Advance Mem. at p. ___." Bandy's Response to Advance's Motion for Summary Judgment will be hereinafter cited as "Bandy Resp. at p. ___."

[3]It is not sufficient under the ADEA to show that the discriminatory animus was only a "motivating factor" in the decision to discharge. *Gross*, 577 U.S. at 174-76; *see also Wright-Thompson v. Potter*, 2010 WL 3294393, at *3 (W.D. Va. 2010).

[4]Rather, the only cases cited by Bandy in his Response deal with general principles such as the proper standard for granting summary judgment and the burdens of proof in age discrimination cases.  (Bandy Resp. at pp. 1-5.)

WOODS ROGERS PLC
ATTORNEYS AT LAW

witness accounts by Bandy's co-workers, Kevin Gray ("Gray") and Sandy Hall ("Hall"), that Bandy had threatened another employee, John King ("King"), to a fight; (3) there is no evidenced of any animosity, including age based animosity, between Bandy and Hall and Gray; (4) Bandy admitted, that at a minimum, his actions could have been viewed as a threat to those of witnessed the incident between himself and King; (5) such a threat is in violation of Advance's zero tolerance Workplace Violence policy; (6) Bandy and everyone else who was deposed knew that Advance had such a policy and that the policy applied to all workers irrespective of age; and (7) Advance has routinely terminated employees—again, irrespective of age—who threaten violence as Bandy did here. *See generally* Advance Mem.

The lack of authority in Bandy's Response is understandable, however, because Advance simply knows of *no* case where a court has held that summary judgment is improper where an employee, as happened here, was terminated for a violation of a known work rule—such as a Workplace Violence policy—and where that work rule has been evenly and consistently applied to individuals both inside and outside of a protected class. And because no such authority exists, Bandy, in his Response, is left to either misstate what is in the record or rely on immaterial facts or arguments in a desperate effort to avoid summary judgment. Stated simply, Bandy may well have been a "Southern gentleman who literally grew up in Advance Auto" as he eloquently argues (Bandy Resp. at p. 6); but being a Southern gentleman does not give an employee such as Bandy the right to threaten violence and not expect adverse employment consequences. *See, e.g., Braveboy v. New Millennium Bldg. Systems, Inc.*, 2009 WL 2997514, at *4 (D. S.C. 2009) ("[t]he ADEA does not require an employer to retain an employee with a good work history if that employee later engages in misconduct warranting termination [such as threatening co-workers]"), *rpt. and recom. adpt.*,

WOODS ROGERS PLC
ATTORNEYS AT LAW

3

2009 WL 2997500 (D. S.C. 2009).

**B.**    **Bandy's assertion that Advance sends older employees to the "Defects" area of the Reclamation Department in an effort to terminate them is irrelevant to his claim of age discrimination and also misstates the "evidence" before this Court.**

Bandy's first argument in his unsuccessful journey to show age discrimination can be found in pages 6 through 12 of his Response. That argument basically is that the "Defects" area of the Reclamation Department is a tougher place to work than other areas of Reclamation, and that Advance allegedly targets older employees and moves them into Defects in order to terminate them because the older employees allegedly cannot perform the job required in Defects. (Bandy Resp. at pp. 6-12.)[5] This argument can be summed up in one word: hogwash!

First, and foremost, it is undisputed that Bandy was not terminated because of his inability to do the Defects job. As stated in his Response:

> Mr. Bandy, like others before him, was sent to the Defects Section to do one thing: fail. But he did not fail. Unlike his elderly co-workers who were forgotten in the oubliette of the Reclamation Department, Mr. Bandy kept up with the rapid pace and onerous duties of the Defects Section . . . . Accordingly, Advance Auto would have to find another way to terminate Mr. Bandy . . . .

(Bandy Resp. at p. 12.) Consequently, if Advance had to find "another way to terminate Mr. Bandy," rather than through his alleged transfer into Defects, then the alleged transfer into Defects is of no moment in determining whether Bandy was the victim of discrimination.

Indeed, Bandy confirmed as much during deposition by admitting that his lawsuit boils down to discrimination as to his termination only—not any alleged transfer to Defects. (Bandy Dep. at pp. 32 (lines 22-24), 33 (lines 1-4).) He also testified that he did not believe

---

[5]"Defects" is the area where defective products that are sent back to the Distribution Center are processed so that they can either be returned to the manufacturer or thrown away. (*See* Myers Dep. at p. 13.)

that he was being discriminated against because of his age during his employment—which would necessarily include his so-called transfer to Defects. (Bandy Dep. at pp. 31-33.) Bandy was also aware that Advance has a policy which prohibits age discrimination in its Handbook, and despite this, Bandy never complained about age discrimination as the policy allowed him to do. (*Id.*; *see also* Exhibit 21, 23 (page bates labeled 0007); Bandy Dep. at pp. 28-29).) He also never complained to his supervisors about working in Defects. (Bandy Dep. at pp. 239-40; Myers Dep. at p. 16; Henderson Dep. at pp. 105-06.) All of this—which Bandy conveniently forgets to mention to the Court—undercuts any claim of discrimination as to this alleged "transfer." [6]

Additionally, Bandy also misstates the record as to the Defects section and the people who worked there. First, contrary to what Bandy claims in his Response, Defects is not an undesirable area of the Reclamation Department. (Meyers Dep. at pp. 83-84; Henderson Dep. at pp. 15-16.) Indeed, one employee, Hall, believes her job was saved when she started working in Defects because she could not perform her earlier job in another area of the Reclamation Department. (Hall Dep. at p. 17; *see also* Gray Dep. at p. 26.) It should also not go without notice that while Bandy would claim that Defects is an undesirable area to work, he also unabashedly testified that he would still want to work in Defects even now. (Bandy Dep. at pp. 159-161.)

Next, there is also absolutely no *evidence* that Advance targets older workers to be sent to Defects. For instance, Bandy himself stated under oath that the Reclamation Department has several areas, one of which is Defects, and *all* General Warehouse Workers, like Bandy, were moved from area to area in the Reclamation Department including into

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[6] The Court has also previously dismissed all of Bandy's claims except for his claim of discriminatory termination. (*See* CM/ECF Document ## 15 and 16.) This includes Bandy's allegation that he was discriminated against when he was allegedly transferred to Defects. (*Id.*)

Defects.  (Bandy Dep. at pp. 127-129, 195; *see also* Myers Dep. at pp. 10-13; Henderson Dep. at pp. 8-13; Gray Dep. at p. 26; Hall Dep. at p. 17.)  These moves, including into Defects, were made, as Bandy conceded, irrespective of an employee's age:

> Q:      That is your -- that is fine, but all I'm asking is, when you were working in Defects, other general warehouse employees were also asked to work in Defects, wherever, but the other general warehouse employees moved from area to area; forget the word cross train, but they moved from area to area, correct?
> A:      Correct.
> Q:      Just like you?
> A:      Correct.
> Q:      Whether they were -- whether they were older or younger than you?  Yes?
> A:      Yes --

(Bandy Dep. at p. 129 (lines 9-20).)

*      *      *

> Q:      Mr. Bandy, do you know of other people that have been moved about from one area of Reclamation to Defects?
> A:      Yes.
> Q:      And do you know people that are younger that have been moved from one area of Reclamation to Defects?
> A:      Yes.

(Bandy Dep. at p. 131 (lines 14-21).)

Not only did Bandy testify that there was no general policy at Advance of moving older workers only into Defects, discovery also revealed that the individual employees identified by Bandy as allegedly being the victims of age discrimination were moved into Defects because of factors other than age.  For example, Bandy was asked to work in Defects because of his knowledge of parts—not age.  (Henderson Dep. at p. 105.)  Carl Pernal ("Pernal") *voluntarily chose* to go work in Defects when his job as a security guard was coming to an end because of outsourcing.  (Pernal Dep. at p. 19-21.)  Pernal made this choice even though there were other jobs Pernal could have easily transferred into besides

WOODS ROGERS PLC
ATTORNEYS AT LAW

Defects. ( *Id.* at p. 21.)  And finally, the assertion in Bandy's Response that Roger Mabe

"quit rather than be forced to work in the Defects Section," and that this is evidence of age

discrimination,[7] is astonishing in light of the following testimony from Bandy:

| | |
|---|---|
| Q: | Okay.  And what is his name, Mabe, Roger Mabe? |
| A: | Yes, sir. |
| Q: | He quit his position; is that what you said? |
| A: | I just explained that. |
| Q: | Well -- |
| A: | What his position was. |
| Q: | Well, I was trying to hear and I apologize.  Did he quit his position? |
| A: | Yes, sir. |
| Q: | And did someone force him to quit; do you know? |
| A: | No, he quit on his own. |
| Q: | Then how is that age discrimination? |
| A: | I didn't say that it was. |
| Q: | Well, you put it in Answers to Interrogatories; I mean, did you look at any of the stuff before you signed under Oath that these were truthful answers? |
| A: | Yes. |
| Q: | Well, then you tell me why you put his name in -- |
| A: | Well, I just put it in his name that he was terminated. |
| Q: | What does that have to do with age discrimination?  Do you think he quit because of age discrimination? |
| A: | No, he quit because he was put in a position where he wasn't satisfied. |
| Q: | Do you think that was age discrimination? |
| A: | No, not really. |

(Bandy Dep. at pp. 251 (lines 20-24), 252, 253 (lines 1-3).)

Finally, and contrary to what Bandy claims in his Response, there is absolutely no

evidence that age was the "but for" reason employees who worked in Defects were actually

terminated.  Specifically, Bandy identified two employees as being the victims of age

discrimination in this manner—Pernal and Warren Smith ("Smith").  Both of these

employees testified, however, that they were terminated for non-age related reasons.  In

particular, both Pernal and Smith were terminated because: (1) they could not meet

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[7](*See* Bandy Resp. at p. 10.)

productivity numbers for scanning items as measured by a computer;[8] (2) the productivity number to be achieved was the same for everyone regardless of age; and (3) the computer which measures productivity does not know an individual's age. (Pernal Dep. at pp. 24-25, 28-29, 31-35; Smith Dep. at pp. 20-27, 31; Exhibits 11, 13, 33 and 44.) Based on this testimony, both Pernal and Smith admitted that they had no evidence that they themselves were the victims of age discrimination. (Pernal Dep. at pp. 33 (lines16-24), 34 (line 1); Smith Dep. at p. 22 (lines 6-9).) [9]

Thus, and stated simply, Pernal and Smith happened to be over 40 when they were terminated for performance while they worked in Defects. They were not terminated *because* they were over 40 as is required for an ADEA violation, or because they worked in Defects. *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 180 (U.S. 2009); *see also Goldberg v. B. Green and Co., Inc.*, 836 F.2d 845, 849 (4th Cir. 1988) (there is no "automatic presumption" that the termination of an employee over the age of 40 violates the ADEA.) Consequently, any argument that Advance moves older people to work in Defects in order to terminate them (whether it be Bandy or someone else) is just not supported by the evidence before the Court.

---

[8]Scanning was not unique to Defects as other areas of the Reclamation Department also required employees to scan product. (Bandy Dep. at p. 140; Smith Dep. at pp. 17-18.)

[9]Bandy makes a big issue of the fact that Pernal and Smith received favorable evaluations in the years prior to their termination. (*See* Bandy Resp. at pp. 9-10.) So what? Both common sense and the law recognize that past good performance is not an indication that it will continue forever into the future. *See, e.g., Diamond v. Bea Maurer, Inc.*, 128 Fed.Appx. 968, 973 (4th Cir. 2005); *Ball v. Wal-Mart Stores, Inc.*, 228 F.Supp.2d 698, 704 (W.D. N.C. 2002), *aff'd.*, 70 Fed.Appx. 120 (4th Cir. 2003); *O'Conner v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 547 (4th Cir. 1995), *rev'd on other grounds*, 517 U.S. 308 (1996). This is especially true where, as here, the past good performance is based on the subjective view of a supervisor who cannot monitor productivity continually, whereas the later bad performance is measured objectively by an impartial computer which can monitor productivity continually. (Pernal Dep. at pp. 26-29.)

WOODS ROGERS PLC
ATTORNEYS AT LAW

**C.    The alleged Henderson statement is not direct evidence of discrimination.**

Bandy's next argument concerns the alleged statement made by Henderson as set forth in the Smith Affidavit.  (*See* Bandy Resp. at pp. 12-16.)  Bandy claims that this is direct evidence of age discrimination.  (*Id.*)  As noted in Advance's Memorandum in Support, however, the alleged comment attributed to Henderson is factually suspect for several reasons.  (*See* Advance Mem. at pp. 20-21.)  This includes the fact that the comment is alleged to have been made at a date it possibly could not have.  (*Id.*; *see also* Smith Dep. at pp. 37-38.)  Additionally, Henderson has adamantly denied making the comment, and Myers has denied hearing Henderson make any such remark.  (Henderson Dep. at pp. 66-67, 73-74, 110; Myers Dep. at pp. 73, 90.)[10]  Nevertheless, Advance understands that for summary judgment purposes it must be assumed that the comment was made by Henderson.

Even if made, however, Advance provided several *separate and distinct* reasons as to why the Henderson comment cannot, *as a matter of law*, be direct evidence of discrimination.  (Advance Mem. at pp. 25-29.)  These included: (1) it is undisputed that Henderson was not the actual decision maker; (2) the comment was "isolated" in that there is only one allegedly discriminatory comment at issue;[11] and (3) there is no nexus between the alleged comment and Bandy's termination because the comment was allegedly made during Smith's termination, did not mention Bandy, and there was a five month gap between the comment and Bandy's termination.  (Advance Mem. at pp. 25-29.)  In his Response, Bandy

---

[10]Smith's Affidavit never mentioned Myers.  (*See* Exhibit 32.)  During deposition, Smith, for the first time, claimed that Meyers was present when the comment was allegedly made and Smith testified that Myers agreed with Henderson's comment. (Smith Dep. at pp. 29-30.)

[11]Bandy has testified that in over 40 years of employment at Advance he never heard Henderson or anyone else make any discriminatory comments based on age, and that he had never even been threatened with termination prior to his discharge for his altercation with King. (Bandy Dep. at pp. 120 (lines 6-23), 124 (lines 11-20), 242 (lines 20-22).)

Woods Rogers PLC
ATTORNEYS AT LAW

9

never addresses arguments (2) and (3) above or the well-settled law which supports those arguments. (*See* Bandy Resp. at pp. 12-16.)  While silence may be golden, Bandy's silence on arguments (2) and (3) above just tarnishes any claim he has that there is direct evidence of discrimination based on Henderson's single comment. *See, e.g.*, *Bodkin v. Town of Strasburg*, 2009 WL 2921291, at *6 (W.D. Va. 2009), *aff'd.*, 386 Fed.Appx. 411 (4th Cir. 2010); *Diamond v. Bea Maurer, Inc.*, 128 Fed.Appx. 968, 972 (4th Cir. 2005), *citing* *O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 548-49 (4th Cir.1995), *rev'd. on other grounds*, 517 U.S. 308, (1996); *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir.1999), *overruled on other grounds*, 539 U.S. 90 (2003); *EEOC v. Clay Printing Co.*, 955 F.2d 936, 942-43 (4th Cir.1992).

What Bandy does dispute is Advance's argument that under *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290-91, 297-98 (4th Cir. 2004), *cert. denied*, 543 U.S. 1132 (2005), the Henderson comment is irrelevant because Henderson was not the actual decision maker who terminated Bandy. (Bandy Resp. at pp. 12-16.)  This does not mean that Bandy disagrees with the assertion that *Lockheed Martin* correctly states the law in the Fourth Circuit. (*Id.*)  He does not. (*Id.*)  Rather, Bandy suggests that *Lockheed Martin* does not apply for two reasons: (1) Henderson has to be viewed as a decision-maker; and (2) Henderson's comment shows that Advance as a company—and not necessarily Henderson as an individual—has a policy to discriminate against older employees. (Bandy Resp. at pp. 14-16.)  Both of Bandy's assertions miss the mark badly.

For example, as to Henderson being a "decision-maker," it is crucial to note the following undisputed evidence.  First, Bandy admittedly does not know who made the decision to terminate him. (Bandy Dep. at p. 14-16.)  Second, Henderson, for his part, has

WOODS ROGERS PLC
ATTORNEYS AT LAW

consistently testified that he played *no* role in deciding whether to terminate Bandy or King. (Henderson Dep. at pp. 25, 51.)  He just asked the witnesses to write statements—not telling them what to write or not what to write—and then turned the statements over to Human Resources.  (*Id.* at pp. 86-91.)  Thereafter, Henderson learned that the decision had been made to terminate both Bandy and King and Henderson was told what to write down in the termination document:

> Q:    So someone told you that they were going to be terminated?
> A:    Yes.
> Q:    You didn't tell someone, no one asked you, "Hey, what should we do?"
> A:    No, nobody asked me on that.
> Q:    Okay.  So the reason you wrote down the termination recap is because someone said, "Look we're going to terminate these guys for violence in the workplace"?
> A:    Uh-huh.  This is what you need to write up here.
> Q:    Okay.  One of the questions that was asked -- and I know you just testified -- you've consistently testified that you had no role in making a determination of what would happen to Mr. Bandy and Mr. King?
> A:    That's correct.

(Henderson Dep. at p. 91 (lines 2-19.) [12]

---

[12]Bandy also claims that Henderson made the decision to terminate "older" workers Pernal and Smith.  (Bandy Resp. at pp. 14-15.)  First of all, this misstates Henderson's testimony. Henderson testified that: (1) he just collected the computer data that showed that Pernal and Smith were not productive as determined by the computer; (2) he turned that information over to Human Resources; and (3) Human Resources then made the decision to terminate these individuals. (Henderson Dep. at pp. 43-44, 49-51.)  Second, even if Henderson had terminated these individuals, it does not matter.  That is, to the extent that Bandy would claim that this shows Henderson had discriminatory animus, how does Bandy explain the fact that Henderson gave all three employees (Bandy, Pernal and Smith) great performance evaluations immediately prior to their terminations. (*See* Exhibits 12, 35, 43.)  Moreover, the terminations of these individuals occurred for reasons that were completely out of Henderson's control—*e.g.* violation of the Workplace Violence policy for Bandy and not meeting productivity numbers as determined by a computer for Pernal and Smith.  The only logical conclusion to be derived from Henderson's positive evaluations, as Bandy himself admitted, is that Henderson did not have any age based bias towards these men.  (Bandy Dep. at pp. 175-77.)

WOODS ROGERS PLC
ATTORNEYS AT LAW

It is also undisputed that the actual decision to terminate Bandy and King was made by Russell, and Russell alone, Advance's Director of Human Resources, Supply Chain. (Russell Aff. at ¶¶ 1-2, 6.) Russell did not know Bandy or his age, and he had no idea about the alleged Henderson comment at the time he made the decision to terminate Bandy. (*Id.*) He also did not consult with Henderson regarding the decision to terminate Bandy. (*Id.*)[13]

Based on these facts, it is shocking that Bandy would even pen that "Mr. Henderson was the decision-maker or at least played a major role in the decision making process to terminate older employees including Mr. Bandy." (Bandy Resp. at p. 15.) Predictably, Bandy does not educate Advance or the Court as to how someone like Henderson—who merely gathered information and drafted a termination report based on what he was told to do— is a "decision maker" under the law as he cites to not one case which supports this far-fetched theory. While Bandy may have an aversion to case law, Advance would point to *Lockheed Martin* itself. 354 F.3d at 297 (supervisor like Henderson was not a decision maker where he "merely initiated the decisionmaking process that led to the [adverse action]"); *see also Collier v. School Bd. of City of Charlottesville*, 2006 WL 435478, at *6 (W.D. Va. 2006) (supervisor was not decision maker where he "may have had some influence on the adverse employment decision, but he [did not make the actual decision]"), *aff'd.*, 218 Fed.Appx. 244 (4th Cir. 2007); *Sawicki v. Morgan State Univ.*, 2005 WL 5351448, at *6 (D. Md. 2005) (noting that *Lockheed Martin* "presents a substantial obstacle to [a] plaintiff who, as here, alleges that she was terminated because of the discriminatory conduct of her immediate supervisors but struggles to show that the ultimate decision maker harbored the same animus"), *aff'd.*, 170 Fed.Appx. 271 (4th Cir. 2006), *cert. denied*, 550 U.S. 902

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[13]Bandy, for his part, did not know Russell and has no reason to believe that Russell had any discriminatory animus as to his termination. (Bandy Dep. at p. 14-16.)

(2007); *Mchugh v. Mayor of Baltimore*, 2011 WL 1135853, at *8 (D. Md. 2011), *aff'd.*, 470 Fed.Appx. 198 (4th Cir. 2012) (same).  Simply stated, if Henderson made the comment, as it must be assumed, the comment is still not direct evidence of discrimination because Henderson was not the ultimate decision maker under well-settled Fourth Circuit precedent like *Lockheed Martin*.  *Id.*

Next, as to Henderson's alleged comment showing that Advance, *as a company*, somehow has a policy to discriminate against employees who were about to turn 70, Advance would simply ask: "Really?"  Where is the *evidence* of such a policy?  Surely, it cannot be based on *one* person claiming that he heard Henderson make this comment (on an impossible date nonetheless) when it is also undisputed that Bandy himself has never heard a disparaging remark in nearly 50 years of employment and there is no other allegation of such comments being made by Henderson or anyone else in this lawsuit or in Bandy's Response. (Bandy Dep. at pp. 120 (lines 6-23), 124 (lines 11-20), 242 (lines 20-22); *see generally* Complaint and Bandy Resp.)[14]

Notwithstanding the absurdity of such a claim, even if one takes the bait and assumes that Advance did have such a policy, it is immaterial as far as Bandy's termination is concerned.  That is because the undisputed evidence before this Court is that the actual decision maker, Russell, not only did not know who Bandy was *but he also did not know Bandy's age* at the time he made the decision to terminate Bandy.  (Russell Aff. at ¶ 2.) Thus, the alleged sinister policy could not have come into play even if such a policy existed.

---

WOODS ROGERS PLC
ATTORNEYS AT LAW

[14]This is exactly the type of unsupported speculation that is not allowed in the summary judgment setting. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Indeed, it is insulting that such an assertion would even be made as Advance is an Equal Employment Opportunity Employer (Exhibit 23) which started modestly in Roanoke and now is a Fortune 500 company and a recognized leader in its industry.  As common sense suggests, a company like Advance simply does not get to where it is by having such alleged policies.

In other words, in order to apply such a policy it is incumbent to know the age of the person being targeted for termination—*e.g.*, whether the person is 70 or not—and Russell did not know whether Bandy was 20, 30 or 70. *Cf. Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2nd Cir. 2005) (in order for there to be age discrimination, the person's age must be known to the decision maker); *Wal-Mart Stores, Inc. v. Williams*, 2003 WL 22220103, at *4 (Ky. App. 2003) *aff'd.*, 184 S.W.3d 492, (Ky. Sup. Ct. 2005) (same).

Moreover, the *evidence*—not inflammatory speculation—is also that Russell made the decision based on witness statements which were forwarded to him. (Russell Aff. at ¶ 3.) He put greater weight on the statements of those who witnessed the altercation (Hall and Gray) rather than the statements of the combatants (Bandy and King)—just as Bandy himself would have done! (*Id.*; Bandy Dep. at pp. 113 (lines 21-24), 114, 115 (line 1).) Based on these statements, Russell believed that both Bandy and King were in violation of Advance's *actual* Workplace Violence policy—and not some *imaginary* policy which requires the termination of employees reaching the age of 70—and he terminated Bandy and King accordingly. (Russell Aff. at ¶¶ 3-4.) Consequently, Bandy's argument that Henderson's alleged comment is somehow direct evidence of a company wide policy that targets employees reaching the age of 70 is without any factual basis whatsoever, and no "*rational trier of fact*" could find otherwise to forestall summary judgment for Advance. *Matsushita*, 475 U.S. at 587 (emphasis added).

**D.      Bandy has not come forth with any evidence that Advance terminated him for discriminatory reasons.**

From pages 16-20 of his Response, Bandy makes various arguments to suggest that his altercation with King should not have resulted in his termination in spite of Advance's

zero tolerance Workplace Violence policy.  Each argument raised by Bandy, however, is either factually or legally incorrect.

For instance, Bandy first takes umbrage with the decision because Advance has, according to Bandy, allegedly only terminated employees in the past under its Workplace Violence policy for actions that were "significantly more egregious" than what transpired between Bandy and King.  (Bandy Resp. at p. 17.)  Notwithstanding the fact that this argument does not accurately reflect the level of Bandy's altercation with King, as set forth further below, Advance would just point out that what Bandy is really asking this Court to do with this argument is to sit as a "super personnel" department and second guess Advance's business decision.  That is, Bandy wants the Court to pass judgment on what is egregious enough or not under Advance's Workplace Violence policy even though that policy simply and unambiguously states that all threats of violence, irrespective of severity, will not be tolerated and leads to immediate discharge.[15]  The Court simply cannot engage in such second guessing of Advance's policy.  *See, e.g., Duffy v. Belk, Inc.*, 2012 WL 1392668, at *2 (4th Cir. 2012) ("in the context of employment discrimination cases '[i]t is not for this court ... to direct the business practices of any company,' nor "sit as a super-personnel department weighing the prudence of employment decisions made by the defendant[]'") (internal

---

[15] The policy states, in pertinent part:

> In order to protect our Team Members, Advance Auto Parts has a zero tolerance policy with respect to threats or incidents of violence or intimidation in the workplace.  *Any* threats, incidents of violence, or intimidation *of any nature whatsoever (including indirect threats* or acts of intimidation) directed against any Team member or other party by another Team Member *will result in immediate termination*.  Incidents may also be referred to local authorities for criminal prosecution where appropriate.

(Exhibit 23) (emphasis added.)

WOODS ROGERS PLC
ATTORNEYS AT LAW

quotation marks and citations omitted).  Indeed, Advance's decision to terminate Bandy for an allegedly non-egregious violation of policy could have been unwise, unfair, or even incorrect, and it would not matter so long as Advance terminated Bandy because it believed that he had violated its Workplace Violence policy.  *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998).  Here, Bandy has no evidence whatsoever to suggest that Advance did not believe that Bandy had violated its Workplace Violence policy (*see generally* Bandy Resp.), and thus, his assertion that this somehow creates an inference of discrimination is flat out wrong and irrelevant.

Additionally, to argue that Bandy's conduct is less egregious than the conduct of the other employees terminated by Advance for workplace violence is also folly.  For example, Bandy conveniently forgets that: (a) one witness, Hall, was so "scared" at what she witnessed—which included Bandy walking towards King shaking his fist—that she immediately went to her supervisor to complain, and while she was doing so she was "shaking" and visibly upset  (Hall Dep. at pp. 7-9, 10, 20-23; Myers Dep. at pp. 17-18; Exhibits 2, 3); and (2) another witness, Gray, described Bandy as being "upset", "angry", and "red" in the face during the altercation, and he actually had to step in between Bandy and King to prevent a fight (Gray Dep. at pp. 7-8, 11, 19-22; Exhibit 31).[16]

The bottom line is this.  The evidence before the Court is that Advance has consistently terminated employees—young and old alike—who threaten violence. (*See* Advance Mem. at p. 13.)  Bandy has not submitted one iota of evidence to dispute this. (*See generally* Bandy Resp.)   Consequently, Bandy's asking the Court to deny summary judgment on his *belief* that his conduct was not severe enough to warrant termination—

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[16]Bandy himself admitted that he said something to the effect of "what do you want to do about it" to King during their argument, and that a third party who heard the statement, such as Gray, could have thought that the statement was an invitation to fight. (Bandy Dep. at pp. 36, 110-11).

although still threatening behavior in violation of Advance's zero tolerance Workplace Violence policy—is misguided to say the least.[17] *See, e.g., Braveboy v. New Millennium Bldg. Systems, Inc.*, 2009 WL 2997514, at *4 (D. S.C. 2009) (no discrimination where employee was terminated for workplace violence and there was no "evidence that similarly situated employees outside of the employee's class engaged in the same type of misconduct"), *rpt. and recom. adpt.*, 2009 WL 2997500 (D. S.C. 2009); *see also King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) ("it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff"), *cert. denied*, 540 U.S. 1073 (2003).

Next, Bandy claims that the environment where the altercation occurred was "noisome and littered with numerous visual barriers." (Bandy Resp. at p. 17.) This, according to Bandy, should somehow discredit what Hall and Gray witnessed. (*Id.* at pp. 17-18.) Again, what Bandy argues is not true and legally irrelevant to boot.

Hall, for example, has been truthful and testified that she did not see and hear everything that transpired. (*See* Exhibit 3). Hall was equally adamant, however, that she did hear and see certain things which she considered as threats, and those were the things that she reported to her supervisor:

> Q: How soon after the incident that you witnessed did you go to Barbara Myers?
> A: Right after this -- right after I noticed it.
> Q: So you didn't wait until the next day?
> A: No.
> Q: Okay. Did anyone tell you to go to Ms. Myers?
> A: No.
> Q: Okay. Now, there are certain things you didn't hear, and you put in your statement you didn't hear them, so you weren't trying to make things up, correct?

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[17] What would be next? There is no violation of policy because an employee only landed one punch in a fight?

| A: | Right. |
|----|--------|
| Q: | But what you saw, you wrote down? |
| A: | Right. |
| Q: | Now, one of the questions Mr. Strelka asked was, you didn't hear Mr. Bandy threaten Mr. King, but you saw actions that looked like to you that were threatening to him? |
| A: | Threatening, yes. |
| Q: | All right.  And so what were those actions again? |
| A: | That he took his fist -- |
| Q: | Okay. |
| A: | -- toward John. |
| Q: | And he moved towards John, correct? |
| A: | Right. |
| Q: | Okay.  And from your perspective, correct? |
| A: | Right. |
| Q: | That you thought that there was going to be a possible fight? |
| A: | Fight. |
| Q: | And is that the only reason you went to Ms. Myers? |
| A: | Yes. |

(Hall Dep. at pp. 21 (lines 16-24), 22, 23 (lines 1-3); Exhibit 3.)  And Gray was standing so close to Bandy and King that he actually stepped in between the two of them when he thought there was going to be a fight. (Gray Dep. at pp. 21-22; Exhibit 31.)  Thus, to try to discredit these witness because of alleged noise and visual barriers is factually erroneous.

Moreover, noisy or not, Bandy's own testimony also undercuts any argument concerning the credibility of Hall and Gray.  That is, Bandy has testified that he had no problems with Hall or Gray prior to his discharge.  (Bandy Dep. at pp. 12-14, 61, 64).[18] Bandy also admitted that he has no reason to doubt Hall or Gray's truthfulness, and that he has no reason to believe that either of them did not like him because of his age.  (*Id*.). Finally, Bandy also has no explanation as to why Hall and Gray would fabricate what they

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[18]Hall and Gray also liked Bandy and had no issues with him either.  (Hall Dep. at pp. 9, 21; Gray Dep. at pp. 24-25, 37.)

put in their statements.  (*Id.* at pp. 274 (lines 19-24), 275 (lines 1-12)).[19]

What is interesting, however, is that even if Gray and Hall were mistaken as to what they saw or heard, because of noise, etc., it does not legally matter.  As Advance pointed out in its Memorandum in Support, what is material is whether there is *evidence* that Russell, the decision maker, believed that threats were made based on the Hall and Gray witness statements, and if he did not, did he nonetheless proceed with termination because of Bandy's age.  *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217-18 (4th Cir 2007) (no pretext where "the uncontested evidence established that . . . the decision maker honestly believed that [plaintiff] deserved to be discharged for threatening [a co-worker], regardless of whether [plaintiff] did in fact issue the threats"), *cert. denied*, 552 U.S. 1102 (2008); *Braveboy* 2009 WL 2997514 at *5 ("although [plaintiff] contends that a genuine issue of material fact precludes summary judgment because he denies that these incidents occurred, whether they actually occurred is not material to this dispute, as it is the decision maker's perception and reasonable belief that matters");  *Tyler v. Ratner Companies*, 2008 WL 2307517, at *8 (D. S.C. 2008) ("[e]ven if [plaintiff] did not use profanity or threaten [a co-worker], she fails to show pretext as she fails to show that the [decision maker] did not have a reasonable belief that this conduct occurred").  Here, there is absolutely *no* evidence whatsoever that Russell did not believe that Bandy had actually threatened King in violation of Advance's Workplace Violence policy as set forth in the Hall and Gray statements, or that

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[19] Bandy also acknowledged that a variety of items that were contained in either the Hall or Gray statements (Exhibits 3 and 31) occurred or could have occurred, thus undercutting his argument that Hall and Gray, because of the environment, are not credible witnesses.  For instance, Bandy remembered that: (a) King said at some point that he and Bandy could go somewhere and have another employee be a lookout (Bandy Dep. at p. 65); (b) he asked King if King was calling him a "liar" (*Id.* at p. 103, 109); (c) he did not recall stepping away from his cart towards King but that he "could have" done so (*Id.* at pp. 116 (lines 18-24), 117 (lines 1-3)); and (d) King used profanity—the "F" word—as Gray had written in his statement. (*Id.* at pp. 206-07).

the Hall and Gray statements were somehow suspect and Russell still decided to terminate Bandy because of his age. (*See* generally Russell Aff. and Bandy Resp.)

Bandy next claims that he should not have been terminated because he only had an "argument" and did not threaten anyone in violation of Advance's Workplace Violence policy. (Bandy Resp. at pp.18-20.) He also alleges that King was by far more inappropriate in his conduct during the altercation. (*Id.*) These assertions fail for the same reasons as set forth above. That is, whether Bandy actually threatened King, or for that matter who was more at fault, is immaterial. What is of critical importance is that Russell believed that Bandy had threatened King (and vice versa) in violation of Advance's Workplace Violence policy based on the witness statements before him, and there is absolutely no evidence that age played any role in Russell's belief which lead to both Bandy's and King's termination. *See, e.g.*, *Holland*, 487 F.3d at 217-18; *Braveboy* 2009 WL 2997514 at *5; *Tyler*, 2008 WL 2307517 at *8.[20] Additionally, this Court can not be asked to play Monday morning quarterback and determine who was more at fault, and thus, who should or should not have been terminated. *Belk*, 2012 WL 1392668, at *2.

Another argument Bandy makes is that the basis of the argument—the rescue of Chilean miners—is "absurd" and that this somehow matters in the outcome of the case. (Bandy Resp. at p. 18.) Advance could not agree more that the basis of the altercation was absurd. However, it does not matter whether the argument was based on the absurd (rescue of miners), the inane (flight speed of a swallow as in Monty Python), or something legitimate (world peace). What is important is what transpired after the absurd discussion started. And

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[20] As stated previously, age could not have played a role in Russell's actions because Russell admittedly did not know Bandy or King or their ages. (Id. at ¶¶ 1-2.) Moreover, Bandy has testified that he would have done the same thing as Russell—*i.e.*, believed witnesses such as Hall and Gray when they stated that threats were made rather than the participants who claimed innocence. (Bandy Dep. at pp. 113 (lines 21-24), 114, 115 (line 1).)

what transpired was that two witnesses (who had no axe to grind) thought Bandy and King had engaged in threats in violation of company policy, and Advance did what it does when such threats are made. It terminated the employees irrespective of their ages.

Next, Bandy believes that the term "heated exchange"—as Bandy used the term in the Complaint—does not, in and of itself, mean that there was a violation of Advance's policy. (Bandy Resp. at p. 19.) Fair enough. But a "heated exchange" where employees reported that Bandy shook his fist, approached his co-worker, and said something that lead two co-workers to believe that a fight was going to occur *is* a violation of Advance's Workplace Violence policy. Even Bandy agreed to as much during his deposition. (Bandy Dep. at pp. 38, 110-111.)

Finally, Bandy takes issue with his termination document because it stated that there had been an "extensive" investigation, and Bandy apparently disagrees that the investigation was "extensive." (Bandy Resp. at p. 20.) This is not only inconsequential but also perplexing. That is to say, after Hall complained about the altercation, Advance took statements from both Hall and the other witness, Gray. (Exhibits 3 and 31; Hall Dep. at pp. 10-12, 20-21; Gray Dep. at pp. 18, 20-21; Henderson Dep. at pp. 86-87.) Bandy and King were also interviewed and asked to provide statements, and they did so. (Exhibits 5 and 6; Henderson Dep. at pp. 89-90.) Bandy, in fact, agreed that he was allowed to fairly present his side of the events during the investigation. (Bandy Dep. at p. 98.) Based on this, it is hard to fathom what else Advance could have done to make it a more "extensive" investigation.[21]

Furthermore, even if Advance's investigation was somehow flawed as Bandy

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[21]Unfortunately, Bandy in his Response does not educate Advance or the Court as to what more could have been done. (*See generally* Bandy Resp.)

suggests, and thus lead to an incorrect decision to terminate Bandy, there would still be no violation of the ADEA.  That is because in order for the "flawed" investigation to legally matter, Bandy would again have to produce evidence that the investigation was purposefully shoddy because Advance had age based animus towards Bandy and that the decision maker, Russell, knew this at the time of his decision and still proceeded to terminate Bandy.  *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 180 (U.S. 2009) (needing to show "but for" age the decision would not have been made); *Holland*, 487 F.3d at 217-18.  Again, no such evidence exits.  (*See generally* Bandy Resp.)  *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (even incorrect, unfair, or unwise decisions not evidence of discrimination).

**E.     Bandy may not be a lawyer, but his admissions that he has no evidence of age discrimination are absolutely relevant.**

In a fitting end to his Response, Bandy claims that his testimony that he has no evidence of age discrimination is irrelevant because he is a lay person.  (Bandy Resp. at 21.) Bandy also coyly asserts, again without any authority to support his position, that any such argument "never works" and is a "waste of time for the Court and counsel."  (*Id.*) Fortunately, the Fourth Circuit, among others, does not share Bandy's myopic view.  *See EEOC v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992)("[u]nquestionably, when a plaintiff admits under oath that he or she cannot point to any statement or piece of physical evidence indicative of age discrimination, it undermines the plaintiff's claim that but for age the employment decision would not have been made"); *see also Johnson v. Interstate Brands Corp.*, 351 Fed.Appx. 36, 40-42 (6th Cir. 2009) (no age discrimination where plaintiff violated workplace violence policy and "[w]hen asked what evidence she had to show that she was discharged because of her age, plaintiff answered: 'I do not have any'"); *Anderson v. NVR, Inc.* 2010 WL 5479637, at *8 (D. Md. 2010) (no evidence of age discrimination where

plaintiff "admits that in her twenty years of employment [with her employer], she never once complained of age discrimination, she never heard a single remark reflecting an age-based bias, and she never encountered a single instance of unfavorable treatment based on age aside from her allegedly discriminatory demotion" which was the basis of the lawsuit). Ignorance of the law is not as blissful as Bandy may think.

## CONCLUSION

Long on rhetoric but devoid of authority, Bandy's Response has not identified any disputed material fact which would allow this case to go to trial. Rather, the undisputed evidence is that Advance has a zero tolerance policy against workplace violence, which includes threats of violence. Bandy (as well as every other person deposed) knew of this policy and he was terminated when two employees—who admittedly had no grudge against Bandy—advised management that they saw Bandy and a co-worker engage in behavior which to them looked like Bandy and the co-worker were threatening to fight each other. Southern gentleman or not, Bandy himself admitted that his actions, at a minimum, could be viewed by those witnessing the altercation as more than a simple disagreement.

The evidence is also undisputed that Bandy was terminated by a decision maker who did not know Bandy or his age. He relied on the statements of the independent witnesses to make the determination to terminate—something that Bandy himself has testified to as being reasonable. And there is absolutely no evidence whatsoever that even if the decision maker was wrong, or the decision to terminate was unwise, or incorrect, that the decision maker had any age based animus. Furthermore, Advance has consistently terminated employees, both young and old alike, who, like Bandy, have violated its Workplace Violence policy. Stated

WOODS ROGERS PLC
ATTORNEYS AT LAW

23

simply, and based on these undisputed facts, Bandy has no evidence to show that "but for" his age he would not have been terminated.

For the reasons set forth in this Memorandum its Memorandum in Support of its Motion for Summary judgment, Advance respectfully requests that the Court grant its Motion for Summary Judgment and that the Complaint filed by Bandy be dismissed, with prejudice, and that Advance recover its costs and attorneys' fees, and such other and proper relief as is just and equitable.

Respectfully Submitted

ADVANCE AUTO PARTS, INC.


By:     /s/ Agnis C. Chakravorty
        Virginia State Bar No. 30225

Agnis Chakravorty (VSB # 30225)
Erin B. Ashwell (VSB # 79538)
WOODS ROGERS PLC
Wachovia Tower
10 South Jefferson Street
P.O. Box 14125
Roanoke, Va 24038-4125
(540) 983-7727
(540) 983-7711 (fax)
achakrav@woodsrogers.com
eashwell@woodsrogers.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2012 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following who is counsel for the Plaintiff:

Thomas E. Strelka, Esq.
Leigh Strelka, Esq.

WOODS ROGERS PLC
ATTORNEYS AT LAW

24

Strickland, Diviney & Strelka
P.O. Box 2866
Roanoke, Virginia 24001-2866


/s/      Agnis C. Chakravorty